David A. Senior (SBN 108759)
Ann K. Tria (SBN 259138)
MCBREEN & SENIOR
1801 Century Park East, 24th Floor
Los Angeles, California 90067
Phone: (310) 552-5300
Fax: (310) 552-1205
dsenior@mcbreensenior.com

Attorneys for Plaintiff
COLIN R. DICKEY

MCBREEN & SENIOR
1801 Century Park East, 24th Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| COLIN R. DICKEY, <br><br> Plaintiff, <br><br> vs. <br><br> COUNTY OF FRESNO, a municipal organization; CITY OF FRESNO, a municipal organization; LISA A. SMITTCAMP; ESTATE OF EDWARD W. HUNT; ESTATE OF GARY D. HOFF; KENNETH HAHUS; ANTHONY BRAGA; WILLIAM A. MARTIN; AND DOUGLAS R. STOKES, <br><br> Defendants. | CASE NO. <br><br> COMPLAINT FOR DAMAGES <br> (42 U.S.C. §§ 1983 and 1988) <br><br> DEMAND FOR JURY TRIAL |

Plaintiff Colin R. Dickey, by and through his attorneys respectfully alleges as follows:

- 1 -
COMPLAINT FOR DAMAGES

MCBREEN & SENIOR
1801 Century Park East, 24th Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

## I.      INTRODUCTION

1.      This civil action, pursuant to 42 U.S.C. §§ 1983 and 1988, and California State law, seeks monetary damages for the extraordinary injuries and harm suffered by Plaintiff Colin R. Dickey ("Plaintiff"), who was wrongfully capitally charged, prosecuted, capitally convicted, and imprisoned on death row at San Quentin State Prison for more than 35 years for the murders of Louis Freiri and Marie Caton in Fresno, California, that Plaintiff did not commit and knows nothing about.

2.      On or about November 8, 1988, Richard Cullumber ("RC") murdered his 76-year-old grandmother Marie Caton and her 67-year-old housemate Louis Freiri at Caton's home in Fresno, California.  Caton's home was found ransacked and all her telephones were disconnected and placed together by the couch in the living room.  RC had a unique telephone obsession that was known to his relatives and reported to the Fresno Police Department ("Fresno PD").  Blood was found on the phones, presumably transferred from RC's hands after he attacked Freiri and Caton with Freiri's cane and a knife.  Four days after the attacks, when RC was cornered by police after a high-speed chase in San Jose (150 miles from Fresno), he shot and killed himself using a handgun registered to Freiri.

3.      Three weeks later, Fresno PD "cleared the case by exception," concluding that RC acted alone in the assaults on Caton and Freiri.  The case was closed.

4.      Consumed by guilt that her son murdered her mother, Lavelle Garrett (Caton's daughter and RC's mother) posted a $3,000 reward to attempt to implicate an accomplice who aided and abetted her son during the murders.

- 2 -

COMPLAINT FOR DAMAGES

Garrett's reward post exclaimed that her son, "Richard Cullumber (also known as "RC")", "brutally and savagely" murdered her mother.  The reward was later increased by Garrett to $5,000.

5.    Garrett immediately told Fresno PD that she suspected her nephew, Dean Long, murdered her mother.  Fresno PD's reports confirm that Fresno PD made minimal efforts to investigate whether others associated with RC or the victims participated in the murders.

6.    More than three months after the crimes, in pursuit of the reward, two drug addicts, Gene Buchanan and Gail Goldman, who were best friends and Dean Long's cocaine supplier, surfaced to claim that Plaintiff had confessed to them he was present in the house in another room when RC went berserk and murdered the victims.

7.    Plaintiff was arrested on February 16, 1989 and prosecuted by the Fresno District Attorney ("Fresno DA") for aiding and abetting RC in a robbery and in two murders under the felony murder rule.  The Fresno DA sought special circumstances and the death penalty against Plaintiff for his purported presence in the house.  The investigation was conducted by the Fresno PD (specifically by Defendant Detective Douglas Stokes) and the Fresno DA (specifically Defendant Senior Deputy District Attorney Kenneth Hahus and Defendants' Investigators Anthony Braga and William Martin).

8.    On March 15, 1991, after a trial wherein Defendants knowingly presented false evidence to obtain Plaintiff's conviction and death sentence, Plaintiff was found guilty of two counts of robbery, one count of burglary, and two counts of homicide.  The jury found true four felony murder special circumstances and one multiple murder special circumstance.  Defendants

MCBREEN & SENIOR
1801 Century Park East, 24th Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

- 3 -

were not required to prove that Plaintiff participated in the killings themselves or even knew RC's intentions.  Plaintiff was sentenced to death.  The California Supreme Court affirmed the judgment on May 23, 2005.  Plaintiff filed two state habeas corpus petitions; both were denied.  A federal habeas corpus petition followed.

9.      On May 31, 2023, the United States Court of Appeals for the Ninth Circuit (the "Ninth Circuit") vacated the special-circumstances findings and the imposition of the death penalty against Plaintiff.  *Dickey v. Davis*, 69 F.4th 624 (9th Cir. 2023).

10.      The Ninth Circuit found (as did the California Supreme Court) that the Fresno DA knowingly presented false evidence at trial, and indeed exploited the use of the false evidence during closing arguments to the jury to pursue Plaintiff's convictions and death sentence.  The Ninth Circuit concluded that the Fresno County DA's knowing use of the false evidence likely resulted in Plaintiff's conviction of special circumstances and the resulting death sentence.  The Fresno DA orchestrated the presentation of Gene Buchanan's false and misleading testimony which was the centerpiece of the Fresno DA's case in support of the capital murder conviction and special-circumstance prosecution.  The Fresno DA, with the assistance of the Fresno PD, violated Plaintiff's constitutional right to due process.

11.      The Ninth Circuit further ordered that the Fresno DA could either grant Plaintiff a new trial on the special-circumstances allegations within ninety days or agree that he may be sentenced to a penalty other than death in conformance with state law.

- 4 -
COMPLAINT FOR DAMAGES

MCBREEN & SENIOR
1801 Century Park East, 24th Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

12. Lacking any evidence besides Buchanan's previously orchestrated lies, the Fresno DA stood down from pursuing a second sham prosecution of Plaintiff on the special-circumstances allegations. The special circumstances and the death sentence are now vacated in final. Moreover, there no longer is an intent to kill finding in the case as is required under California law to be convicted of murder.

13. Instead of prohibiting or discouraging the type of illegal behavior that occurred in this case, the policies, customs, and practices of Defendants City and County of Fresno permitted, encouraged, and in certain instances required it. This illicit conduct permeated the criminal investigation of both the Fresno PD and Fresno DA.

14. If not for the misdeeds of Defendants, Plaintiff would not have been prosecuted, convicted, and imprisoned on California's death row in violation of his constitutional rights, and would not have spent 34 years asserting his innocence and fighting for his liberty in connection with crimes that he did not commit.

15. This lawsuit seeks to hold accountable the government entities and individuals who are responsible for destroying Plaintiff's life, and to recover from them compensation, as well as punitive damages, for Plaintiff's grievous injuries.

**II.    PARTIES**

16. Plaintiff Colin R. Dickey is 59-years-old and was incarcerated in Marin County, California, and now in Del Norte County, California from 1992 to date.

MCBREEN & SENIOR
1801 Century Park East, 24th Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

- 5 -
COMPLAINT FOR DAMAGES

17.    Defendant County of Fresno ("County") is a municipal organization of the State of California, and a resident of California.  Fresno DA is an agency of the County of Fresno, State of California and a resident of California for whose torts the County is responsible.

18.    Defendant City of Fresno ("City") is a municipal organization of the State of California, and a resident of California.  Fresno PD is an agency of the City of Fresno, State of California and a resident of California for whose torts the City is responsible.

19.    Defendant District Attorney Lisa A. Smittcamp is employed by Defendant Fresno DA.  While acting under and with its authority, she knew of the Defendants' violations and failed to act to prevent or correct them.

20.    Edward W. Hunt was the Fresno County District Attorney from 1982 through 2002.  While acting within the scope of his employment and under color of law with its authority, Mr. Hunt was responsible to, inter alia, lawfully train, manage, control, and oversee the Fresno DA staff and the investigation and prosecution of the case involving the robbery and murders of Caton and Freiri in 1988.  Mr. Hunt died on or about April 21, 2012.  The Executors and/or Administrators of his Estate are sued herein as defendants ("Defendant Hunt Estate").  Defendant Hunt Estate is sued in Mr. Hunt's individual and official capacities, for whose torts the County of Fresno is responsible.

21.    Gary D. Hoff was the Fresno County Chief Assistant District Attorney beginning in April, 1987 through and after the completion of the prosecution against Plaintiff.  While acting within the scope of his employment and under color of law with its authority, Mr. Hoff was DA Hunt's chief assistant and

- 6 -
COMPLAINT FOR DAMAGES

MCBREEN & SENIOR
1801 Century Park East, 24th Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

was assigned by Mr. Hunt to be responsible to, inter alia, lawfully train, manage, control, and oversee the DA staff and the investigation and prosecution of the case involving the robbery and murders of Caton and Freiri in 1988.  Mr. Hoff died on or about March 7, 2022.  The Executors and/or Administrators of his Estate are sued herein as defendants ("Defendant Hoff Estate").  Defendant Hoff Estate is sued in Mr. Hoff's individual and official capacities, for whose torts the County of Fresno is responsible.

22.    Defendant Kenneth Hahus was the Senior Deputy District Attorney for the Fresno DA.  As such, he personally set, established, trained others in, oversaw, and managed the policies, customs, and practices of the Fresno DA for the Defendant County of Fresno, including its unconstitutional practices involving the creation and investigation of false evidence, and the suppression of material impeachment and exculpatory evidence for its prosecutions.  Moreover, Defendant County undertook collective inaction to adequately train, oversee, correct, supervise, and/or discipline Defendant Hahus's illegal misconduct.

23.    While acting within the scope of his employment and under color of law with its authority, Defendant Hahus was assigned to the case in the Spring of 1989 upon Plaintiff's arrest.  His first conversation with Gene Buchanan was by telephone on June 21, 1989.  The trial commenced eighteen months later after Defendant Hahus met and interviewed Buchanan at least a dozen or more times during his investigation, performing essentially the same investigatory functions normally performed by a detective or police officer. He is sued in his individual and official capacities, for whose torts the County of Fresno is responsible.

COMPLAINT FOR DAMAGES

24.     Defendants Anthony Braga and William A. Martin at all relevant times were the investigators employed by the Fresno DA acting within the scope of their employment with its authority and under color of law.  They conducted the investigation of the subject crimes for Defendants, working for and at the direction of Defendant Hahus.  They are sued in their individual and official capacities, for whose torts the County of Fresno is responsible.

25.     Defendant Detective Douglas R. Stokes ("Defendant Stokes") at all relevant times was a detective employed by Fresno PD, acting within the scope of his employment with its authority and under color of law.  As a senior homicide detective, he personally set, established, trained others, oversaw, and managed the policies, customs, and practices of the Fresno PD for the Defendant City of Fresno, including its unconstitutional practices involving the creation and investigation of false evidence, and the suppression of material impeachment and exculpatory evidence for its prosecutions.  Moreover, Defendant City undertook collective inaction to adequately train, oversee, correct, supervise, and/or discipline Defendant Stoke's illegal misconduct.

26.     Defendant Stokes was the investigating officer and testified at Plaintiff's trial.  He conducted the investigation of the subject crimes for Defendants.  Like many other witnesses used by Defendants to convict Plaintiff, Defendant Stokes knowingly testified falsely, recanted certain testimony, and admitted under oath that other testimony he provided was false.  *Dickey v. Davis*, 69 F.4th 624, 641-42 (9th Cir. 2023).  He is sued in his individual and official capacities, for whose torts the City of Fresno is responsible.

MCBREEN & SENIOR
1801 Century Park East, 24th Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

- 8 -
COMPLAINT FOR DAMAGES

27. Upon information and belief, each of the Defendants is, and at all times relevant to this Complaint was, the agent, employer/employee, partner, joint venture, alter ego, affiliate, and/or in some manner agents or principals, or both, for each other and were acting within the course and scope of their agency or employment in doing the actions alleged herein, was acting within the course and scope of those such positions at the direction of, and/or with the permission, knowledge, consent, and/or ratification of, the other Defendants. Consequently, each Defendant is jointly and severely liable to Plaintiff for the damages sustained as a proximate result of their conduct.

## III. JURISDICTION, VENUE, AND CONDITIONS PRECEDENT

28. Jurisdiction - This Court has jurisdiction under 28 U.S.C. § 1331 over claims arising under 42 U.S.C. §§ 1983 and 1988 and under 28 U.S.C. § 1343 over claims arising under the common law of the State of California. This action arises under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and under 42 U.S.C. § 1983.

### DIVISONAL ASSIGNMENT [Civil L.R. 3-5]

29. Venue - Venue is proper in the Northern District of California under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions (Defendants' San Jose investigation) and damages suffered by Plaintiff (Marin County death row incarceration and Del Norte County incarceration) giving rise to these claims occurred within this judicial district. Pursuant to Civil Local Rule 3-2(c), this action arises in San Jose County, Marin County, and/or Del Norte County, where a substantial part of the events or omissions giving rise to the claim occurred. Pursuant to Civil Local Rule 3-2(d), (e) &

MCBREEN & SENIOR
1801 Century Park East, 24th Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

- 9 -

COMPLAINT FOR DAMAGES

(f), assignment of this action to the San Francisco or Oakland Divisions, San Jose Division, and/or Eureka Division is proper.

30.     The Government Claims Act does not apply to Plaintiff's federal claims. *Robinson v. Alameda Cnty.,* 875 F. Supp. 2d 1029, 1044 (N.D. Cal. 2012) ("The filing requirement does not apply to ... causes of action based upon federal law."); *Conner v. Raver*, 2023 WL 5498728, at *4 (N.D. Cal. Aug. 24, 2023) ("Contrary to Defendants' argument, Plaintiff has duly complied with all administrative conditions precedent to the commencement of this action. *Williams v. Horvath*, 548 P.2d 1125, 1130 (Cal. 1976) ("[W]hile it may be constitutionally permissible for the Legislature to place [a] substantive impediment in the path of a state cause of action, it is clear that the [S]upremacy [C]lause will not permit a like abrogation of the prerequisites of a federal civil rights litigant."); *Felder v. Casey*, 487 U.S. 131, 153 (1988) ("A state law that conditions that right of recovery upon compliance with a rule designed to minimize governmental liability, and that directs injured persons to seek redress in the first instance from the very targets of the federal legislation, is inconsistent in both purpose and effect with the remedial objectives of the federal civil rights law.  Principles of federalism, as well as the Supremacy Clause, dictate that such a state law must give way to vindication of the federal right when that right is asserted in state court.").

MCBREEN & SENIOR
1801 Century Park East, 24th Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

- 10 -
COMPLAINT FOR DAMAGES

## IV.   FACTUAL ALLEGATIONS

**1.   THE EVIDENCE INVESTIGATED AND DEVELOPED FOR USE BY DEFENDANTS AGAINST PLAINTIFF FOR THE MURDERS AND ROBBERIES OF MARIE CATON AND LOUIS FREIRI WAS COERCED, FALSE, AND DISREGARDED THE TRUTH.**

**A.  The Coerced Statement of Gail Goldman.**

32.     There was no physical evidence linking Plaintiff to the murders. *Dickey v. Davis*, 69 F.4th 624, 631 (9th Cir. 2023).  Plaintiff's fingerprints were not found in Caton's home.  Nor was his blood or his hair, despite the collection of hair from Freiri's left hand, blood from seven sources at the scene, and fingernail scrapings taken from the victims.  No witnesses place Plaintiff at the Caton residence or walking to or from her house (Plaintiff did not own a car).

33.     Plaintiff was arrested by the Fresno PD on February 16, 1989, more than three months after the crimes and after the investigation had been closed because the perpetrator, RC, was identified and then dead, and there was no evidence or reason to believe RC had an aider and abettor in his murderous crimes.  The catalyst for Plaintiff's arrest was that Gene Buchanan came forward seeking Garrett's $5,000 reward and alleged that he overheard Plaintiff state to Gail Goldman that he was present in Caton's house, in another room, when RC went berserk and murdered the victims.  Buchanan claimed that Plaintiff stated that he and RC were in Caton's house to rob Caton and Freiri.  Goldman was Buchanan's best friend and he was her drug dealer.  Goldman was dead at the time of Plaintiff's trial and neither her appearance nor demeanor were observed by the jury, and she was not cross-examined before the jury.

COMPLAINT FOR DAMAGES

34.     Buchanan's statement was arranged for Defendant Stokes by Dean Long.  Dean Long is RC's cousin and the person initially identified by Lavelle Garrett (Caton's daughter) as the suspected murderer.  Defendant Stokes knew this.  Moreover, Buchanan was Dean Long's cocaine dealer.  Defendant Stokes conducted the interview with Buchanan at Long's house.

35.     Buchanan then took Defendant Stokes to Goldman, who Defendant Stokes interviewed alone in his car.  One witness of the Goldman interrogation, a nearby caretaker, came out of her residence and demanded to see Defendant Stokes' identification, and described Stokes as "harassing this poor lady who was crying and shaking," and she threatened to call the police.

36.     Goldman was stoned when Defendant Stokes abducted her.  Goldman described herself as "very highly sedated."  She was afraid of Defendant Stokes.   Defendant Stokes just "drove up and started popping these questions to me and telling me he was going to take me to jail."  Defendant Stokes assured Goldman that he was going to "get her" as an accessory to murder.  Defendant Stokes repeatedly called Goldman a liar.  Defendant Stokes' tactics made Goldman "afraid for her life."  With Buchanan looking on, Defendant Stokes then fully coerced Goldman, upon leading questions, to attempt to parrot Buchanan's allegations.  Goldman "was told" what to say by Defendant Stokes about what she purportedly observed at the Harvard Avenue apartment.  While there are some similarities, the statements taken by Defendant Stokes from Goldman and Buchanan are riddled with inconsistencies about the very same purported extra-judicial confession by Plaintiff.

MCBREEN & SENIOR
1801 Century Park East, 24th Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

- 12 -

COMPLAINT FOR DAMAGES

MCBREEN & SENIOR
1801 Century Park East, 24th Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

37.     At no time did Defendants follow any standard or approved police practices in obtaining the stories from Buchanan or Goldman months after the crimes.  Neither statement was taken at the police department.  There was no reason why these statements could not, and should not, have been formally taken at the police department.  Certainly, there was no urgency.  Neither statement was reduced to writing in the declarant's own words, with or without the participation of the other.  Neither Buchanan nor Goldman were given a polygraph to examine their veracity (despite the obvious incentive by two heroin users to simply be pursuing a $5,000 reward), and no third-party was requested by Defendant Stokes to observe their reactions to such a request.  Neither statement was recorded.  "No other officer was present for the interrogation; no one watched through a two-way mirror; no hidden camera or microphone captured what happened inside the interrogation room." *Milke v. Ryan*, 711 F.3d 998, 1023 (9th Cir. 2013).  If Defendant Stokes took contemporaneous notes during his interrogations, he destroyed them when making his formal report, "so we have absolutely *nothing* contemporaneous" regarding Plaintiff's alleged confession that was reported by Goldman and/or Buchanan.  *Id.* at 1024.

38.     "In effect, [Defendant Stokes] turned the interrogation room into a black box, leaving us no objectively verifiable proof as to what happened inside." *Id.*  Defendant Stokes' freewheeling methods in taking these statements was akin to pursuing a coerced confession from Goldman.  Except these statements were far easier to obtain, with zero consequences to the provider and indefensible consequences to the accused.

- 13 -

COMPLAINT FOR DAMAGES

39.     Defendant Stokes went to great lengths to threaten and coerce a false statement from Goldman.  All of Defendant Stokes' conduct was ratified and directed by the Fresno DA and Fresno PD.  This conduct occurred before Plaintiff was arrested (*see Burns v. Reed*, 500 U.S. 478, 492 (1991)), and it must necessarily have occurred before the existence of probable cause. *Buckley v. Fitzsimmons*, 509 U.S. 259, 274 (1993).

40.     Acquiring coerced and known false statements from a witness for use in a prosecution is akin to fabricating evidence that is unprotected by absolute immunity.  *Milstein v. Cooley*, 257 F.3d 1004, 1011 (9th Cir. 2001).

41.     Goldman was dead by the time of Plaintiff's trial from sepsis flowing from illegal drug abuse.  Her preliminary hearing testimony was read to the jury who had no opportunity to examine her demeanor, and Plaintiff had no opportunity to cross-examine her.  To further enhance the impact of Goldman's coerced statement at trial, Detective Stokes claimed much of Goldman's testimony was incorrect, and he testified at length claiming to correct her testimony by fabricating more allegations against Plaintiff. *Dickey v. Davis*, 69 F.4th 624, 641-42 (9th Cir. 2023) ("Stokes's testimony was problematic for the State, not only because it was contradicted in several key respects by Goldman's pretrial testimony, but also because Stokes was forced to retract some of it.  Most notably, the jury heard Stokes testify in some detail that Goldman told him she overheard Cullumber and Dickey talking about an 'easy ripoff' and 'money being hid' . . .  But Stokes acknowledged on cross-examination that Goldman had never said these things and abruptly recanted this part of his testimony . . .").

MCBREEN & SENIOR
1801 Century Park East, 24th Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

- 14 -

COMPLAINT FOR DAMAGES

## B. The False Statement of Gene Buchanan.

42.     Defendant Stokes first interviewed Gene Buchanan about his allegations against Plaintiff on February 16, 1989.  At this point in time, Defendant Stokes possessed a veritable treasure trove of verifiable facts from his own investigation that undermined Buchanan's credibility and honesty, and raised inculpatory information about whether Buchanan was RC's accomplice in the murders.  Defendant Stokes' conduct was "plainly incompetent" and/or a knowing violation the law.  *Gordon v. Cnty. of Orange*, 6 F.4th 961, 968 (9th Cir. 2021) (quoting *White v. Pauly*, 580 U.S. 73, 79 (2017)).  Defendant Stokes completely disregarded the verifiable facts which he knew and developed earlier in his own investigation.  To adopt Buchanan's unsupported allegations considering the already developed factual investigation was the knowing creation of a false statement from a witness for use in a prosecution; to wit, the fabrication of evidence.

### i.  Defendant Stokes Identified and Verified Plaintiff's Alibi.

43.     Against Buchanan's allegations directed at Plaintiff, Defendant Stokes knew from his earlier investigation that witness Jerry Hodgeboom was a roommate of Buchanan, Plaintiff, Goldman, and RC at the Harvard Street apartment.  He was identified by Defendant Stokes as "very clean cut and very articulate" during his interviews immediately after the crimes.  Hodgeboom advised Fresno PD and Defendant Stokes twice in the days following the crimes that RC "had quickly come back into the house" alone at 9:00 p.m. after being gone most of the day, "seemed in a hurry" and "did not say where he was going."  RC "had come in, in such a hurry" alone, "almost

COMPLAINT FOR DAMAGES

MCBREEN & SENIOR
1801 Century Park East, 24th Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

ran back into the apartment," packed quickly "throwing things into the suitcases," left nothing behind and was there for "10 minutes at the longest." Hodgeboom was uncertain whether someone (e.g., Buchanan in his car) was waiting outside for RC.

44. While all this occurred, Plaintiff sat in the apartment all evening with Hodgeboom and Goldman. RC's departure "took everyone by surprise"; he was never seen again.

45. On November 17, Defendant Stokes again met with Jerry Hodgeboom at Harvard Avenue because he "failed to ask him" whether he was certain on a few facts. Hodgeboom confirmed that it was *Monday night* when RC returned to the apartment in a hurry. It was at 9:00 p.m. "when Richard has almost ran back (sic) into the apartment." Hodgeboom described the two bags that RC packed with "freshly washed" clothes. He did not notice whether RC had any scratches or wounds, but quickly added, he came "in such a hurry," started packing quickly, and left within 10 minutes. Again, Hodgeboom made no mention that RC was with anyone, and Stokes made no inquiry of whether others were present or witnessed these events.

46. This account, from the "very clean cut" and "very articulate" Hodgeboom, is substantially different than the account Defendant Stokes obtained from Gene Buchanan three months later when pursuing the reward, and upon which he elected to base Fresno PD's case. Buchanan claimed that RC returned with Plaintiff; that Plaintiff announced that he had $350; that Plaintiff requested they call the "connection"; that *a half hour later*, RC was still present; that the connection came to Harvard Avenue with heroin and cocaine; RC might have been gathering some clothes during this period; Gail

MCBREEN & SENIOR
1801 Century Park East, 24th Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

- 16 -

COMPLAINT FOR DAMAGES

Goldman and Leo Hyman also were present, and John Inderrienden may have been there; Goldman, RC, Buchanan, and Plaintiff then injected heroin and cocaine; Buchanan has no recollection of RC leaving the house; Buchanan then changed his story and claimed that Plaintiff requested Buchanan to take RC and him for a ride; *then* RC gathered his clothes; and then Buchanan took Plaintiff and RC for a ride where Plaintiff disposed of his shoes and coat, and RC was dropped off downtown.

47.     Buchanan's story also is a far cry from the one Defendant Stokes coerced from Gail Goldman.  She advised Defendant Stokes that RC came back to the house alone.  RC "acted strange because he started packing his clothes and saying he was leaving."  Plaintiff was acting "[t]he same as usual."  Plaintiff stayed "there the whole night"; "he did not leave again that night."  RC "left the house, I don't know how he left, he left out of the house alone. . . .  I didn't see anyone leave with him."  Plaintiff never fled and "remained there living with [her] and the other people in that apartment for a while. . ."  Goldman did not "see Colin with any money that night."

48.     Remarkably, Defendant Stokes hitched his wagon to Buchanan's story, obtained three months after the crimes while Buchanan – a heroin and cocaine intravenous drug addict – was admittedly pursuing a $5,000 reward. Buchanan's story was a purported account of numerous events that occurred while Buchanan admittedly was stoned on heroin and cocaine, according to his own testimony.  In doing so, Defendant Stokes disregarded the contemporaneous interviews on the days following the crimes that he took from Jerry Hodgeboom, whom Stokes described as "very clean cut" and "very articulate."

MCBREEN & SENIOR
1801 Century Park East, 24th Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

- 17 -

COMPLAINT FOR DAMAGES

49.    Defendant Stokes further disregarded three statements he took attempting to corroborate the very suspect accounts given by Buchanan and Goldman.  On February 18, 1989, Stokes interviewed David Smothers, Plaintiff's roommate at the time of his arrest.  He was "legitimately surprised" by Plaintiff's arrest, and by the charges.  Smothers saw Plaintiff a few times between the crimes and RC's suicide, and Plaintiff never mentioned any involvement or mentioned the situation "at all."  Stokes then interviewed Charles McCoy who "was adamant about stating that [Plaintiff] has made no statements to him since the incident about his involvement . . ."

50.    On February 21, Stokes interviewed Steve Istre who "spent a lot of time with [Plaintiff] after the homicide."  "At no time" did Plaintiff "talk about the incident or indicate in any way that he was involved."

### ii. Defendant Stokes Established that Buchanan Fled with RC After the Murders.

51.    Defendant Stokes immediately confirmed that RC fled on the evening of the murders.  He quickly discovered that RC took refuge at Fresno's Easy 8 Motel.  On November 11, Defendant Stokes went to the Easy 8 Motel, and confirmed that RC had rented a room on November 7 and 8 while fleeing after the crimes.  In taking possession of all of RC's belongings in the room, Defendant Stokes also found Buchanan's prescription vial in the room.  Buchanan fled the Harvard Avenue apartment with RC after the crimes, taking his vial of drugs to the Easy 8 Motel.

52.    What Defendant Stokes confirmed in the days following the crimes was RC had been living at the Harvard Avenue apartment with Hodgeboom, Buchanan, and others; that RC immediately fled after the crimes; he fled to

MCBREEN & SENIOR
1801 Century Park East, 24th Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

- 18 -
COMPLAINT FOR DAMAGES

the Easy 8 Motel in Fresno; and there was evidence that Buchanan's property also was in the room at the Easy 8 Motel where RC was hiding.

53.     RC then fled to San Jose.  RC met with his "roommate", and telephoned him several times before committing suicide.  Since Plaintiff never left his home after the crimes (unlike Buchanan and RC who immediately fled), and didn't have a car (unlike Buchanan) or a phone at the apartment, the roommate that RC was conferring with likely was Buchanan.

54.     Buchman remained on the lam until months later when he surfaced to learn from Goldman that Plaintiff was questioning whether Buchanan was also involved with the murders because he fled at the same time as RC and had not returned.  To attempt to protect himself, Buchanan then manufactured his allegations against Plaintiff and pursued the reward.

55.     In immediately adopting Buchanan's allegations more than three months after the crimes, Defendant Stokes plainly was incompetent for failing to investigate the facts he earlier developed at the time of the crimes, as well as where Buchanan fled to in the days following the crimes and whether he was staying with RC at the Easy 8 Motel, and if so, why.

### 2.  THE STATE'S CONCEALMENT OF MATERIAL IMPEACHMENT EVIDENCE REGARDING BUCHANAN DURING PRETRIAL PROCEEDINGS RESULTED IN PLAINTIFF'S INDICTMENT, CONVICTION, DEATH SENTENCE, AND DEPRIVATION OF LIBERTY.

#### A.  Criminal Case No. 017993-7.

56.     On May 4, 1988, six months prior to the Caton/Freiri murders, criminal complaint case number 017993-7 was filed against Gene Buchanan charging him with two felony drug possession counts.

- 19 -

COMPLAINT FOR DAMAGES

MCBREEN & SENIOR
1801 Century Park East, 24th Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

MCBREEN & SENIOR
1801 Century Park East, 24th Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

57.   It was the policy or custom of Defendant Fresno DA at preliminary hearing calendars for its Deputy Assistant DA's to meet with criminal defense lawyers and their client defendants in chambers and off the record to discuss quid pro quos of testimony by the defendant against third party criminal defendants in exchange for the dismissal of pending charges.  It was Defendant Fresno County DA office policy or custom for the Deputy DA to have the quid pro quo deal ratified by Supervisor DAs, including the Chief Assistant.  Defendant Fresno DA set this office policy or custom in order to suppress the quid pro quos, i.e., the exchange of government favors given to the criminally accused in exchange for testimony needed to prosecute cases.

58.   Defendant Fresno DA did this with Buchanan regarding case number 017993-7.  The quid pro quo was that Defendant Fresno DA would dismiss case number 017993-7 in exchange for Buchanan testifying against Plaintiff and alleging that Plaintiff made inculpatory statements about being present as an accomplice when RC murdered the victims.

59.   On June 21, 1989, Gene Buchanan spoke to Defendant Hahus.  He advised Defendant Hahus that he had an agreement with Defendant Fresno DA to dismiss case no. 017993-7 in exchange for his future testimony against Plaintiff, and that in accordance with Fresno DA policy or custom the agreement was not placed on the record in his pending drug case so that the quid pro quo and prosecutorial favor would be concealed from Plaintiff, his counsel, and the jury at Plaintiff's future trial.  This discussion was concealed from Plaintiff by Defendant Fresno DA and was impeachment evidence: Buchanan believed he was receiving a quid pro quo, Buchanan was suppressing that information from Plaintiff, and Buchanan was being

- 20 -

COMPLAINT FOR DAMAGES

dishonest in his involvement as a witness against Plaintiff with the complicity of Defendant Fresno DA who employed a policy and custom of having in chambers conferences in order to suppress impeachment evidence from defendants.

60.     The existence of this Fresno DA office policy and custom, i.e., the in-chambers off the record deal making, and/or the deal itself was *Brady* material and disclosure to Plaintiff was required by Defendants.  *Dickey*, 111 P.3d at 937 ("this information would have been *favorable* to defendant insofar as it tended to impeach Buchanan's credibility . . .").  In accordance with Defendant Fresno DA training, policy, and custom, Defendant Hahus and Buchanan suppressed the disclosure of this impeachment evidence in violation of Plaintiff's right to due process.

61.     Learning of these facts during their June 21, 1989 conversation did not spur an investigation by Defendant Hahus about the credibility and/or believability of Buchanan – his star witness to be used against Plaintiff – who was telling Defendant Hahus that a dismissal agreement already had been made, it was suppressed from the court record with Fresno DA's complicity by its policy and custom, and that together, the parties would deceive the criminal justice system, including Plaintiff, the court, and the yet-to-be empaneled jury in Plaintiff's case.  The custom and policy was employed by Deputy District Attorneys and overseen and approved by supervising DAs and the Chief Deputy District Attorney, in this case, Gary D. Hoff.

62.     Learning of these facts during their June 21, 1989 conversation did not spur an investigation by Defendant Hahus as to whether Buchanan was lying or not credible even though there was a deceptive conspiracy orchestrated by

MCBREEN & SENIOR
1801 Century Park East, 24th Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

- 21 -

MCBREEN & SENIOR
1801 Century Park East, 24th Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

the Defendant Fresno DA's Office and Buchanan.  Hahus' investigation was either "plainly incompetent" and/or was caused by a failure to train, supervise, and manage his conduct.

63.     During this conversation with Buchanan, Defendant Hahus was in possession of a written memo from Chief Deputy District Attorney Gary Hoff that stated that a plea agreement on Buchanan's case was in fact made to ensure his presence for testimony against Plaintiff.  Defendant Hahus therefore knew that a prosecutorial favor had been provided to Buchanan for his allegations against Plaintiff, that it was in fact off the record in Buchanan's criminal prosecution, and that this *Brady* material had been suppressed from Plaintiff.  Defendant Hahus's investigation continued the suppression in accordance with Fresno DA office custom, policy, and practice.

64.     The subject drug case pending against Buchanan was in fact dismissed by Fresno DA on July 18, 1989.  This disposition was consistent with Buchanan's advices to Defendant Hahus, and in accord with Fresno DA custom, policy, and practices as overseen by its Chief Deputy District Attorney Hoff.  Defendant Fresno DA, as overseen by Chief Deputy District Attorney Hoff and Defendant Hahus, thereafter falsely asserted that Buchanan's case was dismissed for problems with the search warrant.

65.     Fresno DA's disposition of Buchanan's case was inconsistent with its disposition of the related case filed against a co-defendant, Armando Ramirez (aka Arthur Romero).  Ramirez was arrested on May 2, 1988 with Buchanan, and was charged with two counts of possession of cocaine and heroin.  His arrest was under the ambit of the same search warrant that applied to Buchanan.  On June 14, 1988, Ramirez was forced to plead guilty to count

COMPLAINT FOR DAMAGES

one, the same count that was later dismissed against Buchanan.  There was no search warrant problem as it pertained to Ramirez, the co-defendant who was not providing false testimony for Fresno DA and who was not receiving prosecutorial favors.  The false assertion as to the reason for the dismissal of case no. 017993-7 against Buchanan was consistent with Fresno DA office policy and practice.

66.    Defendant Hahus's investigation violated Plaintiff's *Brady* right to due process.

### B.  Criminal Case No.  M48975-7.

67.    Fresno DA was contacted by Buchanan on October 15, 1990, regarding case M48975-7, charging Buchanan under Health and Safety Code section 11550 and Business and Professions Code 4149.  Buchanan was under the impression that Fresno DA, and specifically Defendant Hahus as supervised by Chief Deputy District Attorney Hoff, would help him get lenient treatment on these charges, in accordance with Fresno DA custom and policy, as a prosecutorial favor for having provided false testimony for Defendants against Plaintiff.

68.    On October 15, 1990, Defendant Hahus learned from Buchanan that he had been arrested for being under the influence of a controlled substance.  Buchanan asked Defendant Hahus to get the charge dismissed, as was the policy and custom of Fresno DA.  This was several months before Plaintiff's trial was to commence.

69.    Buchanan's mere October 15, 1990 solicitation of favorable treatment on his pending criminal charges from Defendant Hahus during Defendant Hahus's investigation was *Brady* material that could not be suppressed from

MCBREEN & SENIOR
1801 Century Park East, 24th Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

- 23 -

Plaintiff. *Wearry v. Cain*, 577 U.S. 385, 390 (2016) ("State had failed to disclose that, contrary to the prosecution's assertions at trial, Brown had twice sought a deal to reduce his existing sentence in exchange for testifying against Wearry. The police had told Brown that they would 'talk to the D.A. if he told the truth.'"). Defendant Hahus suppressed the disclosure of Buchanan's "request for a deal" to Plaintiff in accordance with Fresno DA policy and practice in violation of Plaintiff's *Brady* right to due process.

70. On April 17, 1991, after Defendant Hahus obtained the verdicts against Plaintiff by knowingly using false testimony from Buchanan, he personally appeared in court and asked the court to dismiss the charges because Buchanan had provided testimony against Plaintiff. Defendant Hahus' action comported precisely with Buchanan's stated request and his expectations before he testified against Plaintiff.

71. Defendant Hahus' actions, consistent with Defendant Fresno DA office policy and custom, to dismiss this case in exchange for Buchanan's false testimony against Plaintiff was a prosecutorial favor, or a quid pro quo for his testimony. The quid pro quo and prosecutorial favor were concealed from Plaintiff, his counsel, the court, and Plaintiff's jury. The suppression violated Plaintiff's *Brady* right to due process.

### C. Fresno DA's Provision of Two Years of Housing, Food, and Cash Advances to Buchanan.

72. Defendant Hahus knew that Defendants Martin and Braga arranged for $350 in monthly room and board for Buchanan beginning on March 29, 1989. Defendants Fresno DA, Hahus, Martin, and/or Braga never advised Plaintiff that: 1) Maggie Strickland, Defendants' agent and Buchanan's

COMPLAINT FOR DAMAGES

MCBREEN & SENIOR
1801 Century Park East, 24th Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

boarding house owner, also gave Buchanan cash advances; 2) payment for the room and board services was contingent upon Buchanan's receipt of a $5,000 reward (if his testimony led to a guilty verdict), yet Buchanan's balance due Strickland was $9,100 by the time of Plaintiff's trial; and 3) Strickland ultimately discounted Buchanan's $9,100 balance by 62% to $3,500.

73.     Defendants Fresno DA, Hahus, Martin, and Braga procured $5,600 in favors for Buchanan.  Defendants brokered a deal for Buchanan with their agent, Strickland, wherein Buchanan could default on his debt.  And Buchanan did so by $5,600.  During their investigation, Defendants concealed this *Brady* impeachment material from Plaintiff.  Moreover, Defendants knowingly presented false evidence denying that these prosecutorial favors were provided.  The suppression of this *Brady* material allowed Defendants to knowingly present false evidence at Plaintiff's trial in violation of Plaintiff's right to due process.

### D. Fresno DA's Failure to Prosecute Buchanan as an Undisclosed Prosecutorial Favor in Exchange for His Testimony Against Plaintiff.

74.     On cross-examination at trial, Plaintiff's counsel asked Buchanan what type of drugs he took the day before his testimony.  To keep Buchanan's integrity and credibility intact, Defendant Hahus suggested that Buchanan assert his 5th Amendment privilege against self-incrimination.  The jury then was dismissed, and the judge inquired "whether your office would seriously think of prosecuting him if he were to respond to that question if he used drugs."  Defendant Hahus knew precisely Defendant Fresno DA's policy and custom of prosecuting crimes of possession of heroin and cocaine, needles

- 25 -
COMPLAINT FOR DAMAGES

and drug paraphernalia, and for drug use, and was in the process of doing so with Buchanan.  Nevertheless, Defendant Hahus replied, "I don't know."

75.     With the cross-examination question still pending, Defendant Hahus requested and received the court's permission to have an ex parte, off-the-record chat with Buchanan outside the courtroom.  The parties returned to the courtroom and then purported to put on the record the contents of their private discussion.  Buchanan told Plaintiff's counsel that "[t]here was nothing said I couldn't be prosecuted.  I was not told I would not be prosecuted."  Buchanan then admitted under oath to using heroin and cocaine the day prior, and being a drug dealer and broker.  "You . . . refer people to your connection and you get money back; is that right?  A. Yes, sir, yeah, right."

76.     In fact, there was an agreement between Defendant Fresno DA and Buchanan, in accordance with its custom and policy, that charges would not be filed against him for the criminal admissions he made under oath in exchange for waiving his Fifth Amendment right and for his false testimony against Plaintiff.

77.     Defendant Fresno DA had Buchanan's admissions on the record of heroin and cocaine use, possession of drug paraphernalia, and for dealing both heroin and cocaine, and it had a daily reporter's transcript of those admissions.  Thereafter, Defendants Fresno DA and Fresno PD never took any action to have charges filed or prosecuted against Buchanan. Defendants' inaction was a quid pro quo for Buchanan's false testimony against Plaintiff.

MCBREEN & SENIOR
1801 Century Park East, 24th Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

- 26 -
COMPLAINT FOR DAMAGES

MCBREEN & SENIOR
1801 Century Park East, 24th Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

78. Defendant Hahus knew that "witnesses who have cases against them tend to try to use the District Attorney's Office . . . as get-out-of-jail-free cards, thinking that, 'Well, now since I'm cooperating with the police or the DA's Office they'll help me.'" Buchanan knew this as well; he pursued favors in the foregoing pending criminal cases from various Fresno DAs, involving its managing attorneys, because he was a witness "in a PC 187, Dickey."

79. There was – at a minimum – a tacit understanding between Defendant Fresno DA and Buchanan that no charges would be pursued. Defendant Hahus admitted under oath that "[a]fter Buchanan testified, I took no action to initiate a criminal investigation or prosecution against him for possible crimes including illegal drug use, possession of Heroin, cocaine, or other illegal drugs, the sale or distribution of illegal narcotics, or the possession, use, or ownership of illegal drug paraphernalia." Moreover, Defendant Hahus has "no recollection of ever requesting anyone at the Fresno Police Department, including Detective Doug Stokes, to commence an investigation of Gene Buchanan as a result of this testimony." Hahus "did not commence or attempt to initiate such a prosecution against Buchanan because he was a key prosecution witness in Mr. Dickey's capital homicide trial." His "inaction in this regard was extended to Buchanan as a result of, or a consequence of, his testimony in Mr. Dickey's trial."

80. Seven months after trial, hearings were taking place on Plaintiff's motion for new trial. For seven months, Defendant Fresno DA was obligated to advise Plaintiff and his counsel and the court that in exchange for Buchanan's testimony, no prosecution would be initiated regarding Buchanan's criminal admissions at the trial. The decision not to prosecute

COMPLAINT FOR DAMAGES

clearly was known to Defendants and it unquestionably constituted favorable *Brady* evidence for the court's consideration.  The court then would have had a complete factual record upon which to examine Plaintiff's motion, and to measure Defendant's position that the two case dismissals were not material favors in exchange for Buchanan's testimony.

81.     "The prosecution's suppression of this [decision] in state court distorted the fact-finding process, forcing the state judge to make [his] finding based on an unconstitutionally incomplete record.  This is not a situation where the record was incomplete because of anything [Plaintiff] did or failed to do.  The prosecution had an 'inescapable' constitutional obligation under *Brady* and *Giglio* to produce the evidence."  *Milke v. Ryan*, 711 F.3d 998, 1007 (9th Cir. 2013) (quoting *Kyles v. Whitley*, 514 U.S. 419, 438 (1995)).

82.     Defendants' "failure to comply with that requirement rendered the factfinding 'process employed by the state court . . . defective.'" *Id.* (quoting *Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004)).

### E. A Dozen-Plus Pretrial Meetings Between Defendant Hahus and Buchanan.

83.     Buchanan testified that he was truthful when he "can be."  He testified he met with the Defendant Hahus only a couple of times, implying that his testimony was not rehearsed, but that he had an honest and unvarnished recollection of events.  Defendant Hahus argued that Buchanan's unrehearsed recollection gave it "the ring of authenticity."

84.     In fact, Defendant Hahus "met with Gene Buchanan probably at least a dozen times before the trial.  Buchanan was the critical key witness for the People."  Sandpapered testimony requiring at least a dozen meetings is less

MCBREEN & SENIOR
1801 Century Park East, 24th Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

- 28 -

COMPLAINT FOR DAMAGES

credible than spontaneous testimony. Plaintiff was entitled to cross-examine Buchanan about his many meetings with Defendant Hahus and make this argument to the jury. Instead, the jury was told to focus on the lie that Buchanan only met with Hahus a "couple" of times before testifying.

85. Defendants suppressed calendars, notes, diaries, file entries and other *Brady* material reflecting that its investigation involving Buchanan's story involved at least a dozen conferences to get his story straight. If *Brady* material regarding the quantum of conferencing had not been suppressed, the jurors would have learned that Buchanan lied to them and Defendant Hahus could not have argued that Buchanan's testimony had a "ring of authenticity." Instead, Plaintiff could forcefully have made the counterargument: Even a dozen meetings could not cure Buchanan's inconsistencies with Goldman's claimed observations; Buchanan cannot recall events he testified to earlier; and his regular drug abuse impairs his ability to pay attention, observe, and recall events – so much so, that at least a dozen pretrial conferences with Hahus were required to manufacture his testimony. Buchanan's sketchy testimony did not have a "ring of authenticity," but instead had zero reliability. *Brady* material identifying the dozen or so meetings Defendant Hahus had with Buchanan would have shut down the prosecution's charade and been used to destroy Buchanan's honesty and credibility.

MCBREEN & SENIOR
1801 Century Park East, 24th Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

- 29 -

### 3. DEFENDANTS' FALSIFICATION OF RECORDS TO ATTEMPT TO BOLSTER THE FALSE STATEMENTS OF BUCHANAN AND GOLDMAN BY LINKING PLAINTIFF TO THE LIGATURE AND THE PLAINTIFF'S FINGERPRINT FROM A BLIND IN HIS OWN APARTMENT.

86. A ligature, perhaps from a blind, was found around victim Freiri's neck at the crime scene. Although Defendant Stokes knew this immediately after the crimes and knew that RC was the prime suspect of the crimes, and then went to RC's Harvard Avenue apartment (shared by Buchanan, Goldman, and Plaintiff) immediately after the crimes, Defendant Stokes never pursued a search warrant or conducted a search of the apartment to attempt to link the ligature to anything, including a blind, in the apartment. Defendant Stokes' conduct was "plainly incompetent" and/or was caused by a failure to train Stokes adequately resulting in a violation of Fresno PD practices, training, and protocols.

87. More than three months after the crimes, and after the apartment had been vacated and fully cleaned, Defendant Stokes took cords as samples from three other blinds at the Harvard Avenue apartments. Gary Cortner, a criminalist with Defendants' agent, the California Department of Justice, compared the cord samples taken by Defendant Stokes from various blinds in the Harvard Avenue apartment to the ligature removed from Freiri's neck.

88. Cortner "could not conclude the cord found at the crime scene was the same cord or from the same spool as any of the samples taken from the blinds at the Harvard Avenue apartment." *Dickey v. Davis*, 69 F.4th 624, 641 (9th Cir. 2023). Cortner could not make this conclusion because the cords in fact were not a match with the ligature: the ligature was a braided cord composed

- 30 -

COMPLAINT FOR DAMAGES

MCBREEN & SENIOR
1801 Century Park East, 24th Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

MCBREEN & SENIOR
1801 Century Park East, 24th Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

of an outer casing with eight strands, each with five threads, braided over a central core.  The outer casing is composed of cotton fibers, and the inner core is rayon.  The three cord samples recovered from the Harvard Avenue apartment are all similar to one another.  They are braided cord composed of an outer casing with eight strands each with six threads, braided over a central core.  The outer casing is composed of undyed cotton fibers, and the inner core is yellow cotton fibers – a distinctly different color of the central core can be seen.  These facts are not disputed by the California Attorney General.  Cortner's testimony that he could not match the cords to the ligature certainly was not the whole truth – the whole truth was that Defendants' agent Cortner failed to confirm the cords do not match the ligature.  Cortner's report was knowingly incomplete and false in this regard in violation of Plaintiff's right to due process.  *Napue v. Illinois*, 360 U.S. 264 (1959).

89.     Defendant Stokes further attempted to link Plaintiff to the ligature by searching for Plaintiff's fingerprints on a blind that purportedly came from Plaintiff's own residence.  While "it is neither surprising nor incriminating that Dickey's thumbprint would be found on a blind taken from the home where he lived," *Dickey v. Davis*, 69 F.4th 624, 640 (9th Cir. 2023), Defendant Stokes nevertheless directed and oversaw the creation of a false report from Michael Hall at the California Department of Justice.  Hall falsely reported that only a single thumbprint was found on the blind and it belonged to Plaintiff.

90.     Contrary to Hall's false report orchestrated by Defendants, forensic examiner Peter Barnett at Forensic Science Associates ("FSA") examined the

- 31 -

COMPLAINT FOR DAMAGES

blind and found additional fingerprints but could not determine their source. This fact was admitted by the California Attorney General after trial. Barnett found:

> Examination of the Venetian blinds, Item 39,
> revealed several latent fingerprints which had been
> developed by previous examiners but did not
> appear to have been lifted.  (The normal technique
> for Examination of an object for latent fingerprints
> is to process the object to develop the latent prints,
> then make lifts of the prints for comparison
> purposes.) Four latent prints which are potentially
> capable of identification were found.

91.    Barnett's finding of numerous prints on the blind is consistent with substantial evidence: Buchanan claimed it was touched by Plaintiff;  Plaintiff claims he touched the blind when it was used on the back door at the apartment; Goldman claims it was touched by RC; Edith Hays claims she removed it from the closet in December; Hays transported the blind to her home from Harvard Avenue; and Jerry Lillard claims he may have removed it from the closet while cleaning the apartment.  Moreover, it purportedly was a blind that was fully cleaned with the apartment when it was vacated in mid-December.

92.    Notwithstanding, Defendants falsified a report during their investigation with Michael Hall at the DOJ that Plaintiff's fingerprint was the only one on the blind.  The knowing creation of false evidence to pursue and secure a conviction is a violation of due process.  *Napue v. Illinois*, 360 U.S. 264 (1959).

93.    Defendant Stokes went to great lengths to create a false fingerprint report by the DOJ.  All of Defendant Stokes' conduct was ratified and

MCBREEN & SENIOR
1801 Century Park East, 24th Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

COMPLAINT FOR DAMAGES

directed by Defendant Fresno DA.  This conduct occurred during the investigation.

94.     Acquiring known false reports from a witness for use in a prosecution is akin to fabricating evidence that is unprotected by absolute immunity. *Milstein v. Cooley*, 257 F.3d 1004, 1011 (9th Cir. 2001).

### 4.     DEFENDANTS' EVIDENCE UNDERMINES THE PROSECUTION'S TIMELINE.

95.     Defendants unreasonably failed to examine the data collected from the crime scene to develop an accurate timeline of the crimes and scrutinize it against the reward seeking stories provided by Buchanan and Goldman.

96.     Defendants had reason to suspect that the victims might not have been attacked after dinner on November 7, 1988, in accordance with the time frame provided by Buchanan and Goldman, but rather after lunch on the afternoon of November 8, 1988.

97.     In the initial report prepared by Detective Chilberto on November 8, 1988, Defendant Fresno PD placed the time of attack anywhere between 6:00 p.m. on November 7, 1988, the time Garrett last spoke to her mother, and November 8, 1988 at 2:00 p.m., the approximate time the mail found in the mail slot would have arrived at the Lewis Street address.  The latter time does not establish the end of the period with any certainty.

98.     At approximately 8:15 p.m. on November 8, 1988, Deputy Coroner Pimental conducted a liver temperature examination of Freiri at the crime scene and discovered that Mr. Freiri's temperature was 87 degrees.  This temperature reading should have placed Freiri's time of death at sometime between seven and eleven hours earlier.  In combination with information

MCBREEN & SENIOR
1801 Century Park East, 24th Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

- 33 -

gathered at Freiri's autopsy, that the contents of his stomach were no more than one to two hours old, there was reason for Defendants to conclude that the attacks did not take place after dinner on November 7, 1988. Moreover, the "Coroner's Certificate & Verdict" prepared by David M. Hadden, M.D., Coroner, notified Defendants that "death occurred on the 8th day of November."

99.     From the canvassing of witnesses done by Fresno PD on November 8, 1988, there were additional indications that the attacks had not occurred on the evening of November 7, 1988. Defendant Stokes reported on November 9, 1988, a neighbor of Ms. Caton, Nena Frutos, reported seeing Marie Caton at the market on November 8, 1988, at around 12:00 p.m. She stated that Caton had been alone and that the two had spoken. In addition, another neighbor, Valerie Montez, reported seeing a woman standing behind the screen door of the victims' residence at approximately 4:00 p.m., three to four hours before the victims were discovered.

100.    Defendant Stokes' conduct was "plainly incompetent" and/or was caused by a failure to train Stokes adequately resulting in a violation the Fresno PD practices, training, and protocols.

### 5.      DEFENDANTS' WILLFULLY FAILED TO INVESTIGATE EVIDENCE OF THIRD-PARTY CULPABILITY REGARDING THEIR DUBIOUS CO-CONSPIRATOR THEORY FUELED BY GARRATT'S $5,000 REWARD OFFER.

101.    The murders of Marie Caton and Louis Freiri were committed by RC, who then played with their telephones and committed suicide with victim Freiri's gun in San Jose a few days after the murders.

MCBREEN & SENIOR
1801 Century Park East, 24th Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

COMPLAINT FOR DAMAGES

MCBREEN & SENIOR
1801 Century Park East, 24th Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

102.   Defendant Stokes surmised that the crime scene suggested that more than one person plausibly was involved in the crimes based upon the proximity of the victims and the nature of their wounds.  This meaningless verbal salad from Defendant Stokes did not fuel any efforts by him to look for another suspect in the hours, days, weeks, or months following the crimes.  Indeed, he concluded that RC acted alone and closed the case following RC's suicide.  Defendant Stokes' conduct was "plainly incompetent" and/or was caused by a failure to train Stokes adequately resulting in a violation the Fresno PD practices, training, and protocols.

103.   Remarkably, although RC was an immediate suspect, Defendants never obtained a search warrant for his residence (which also was the residence of Plaintiff, Gail Goldman, and Gene Buchanan) to search for any property, money, or evidence that could link RC or perhaps his roommates to the crime scene.  Defendant Stokes' conduct was "plainly incompetent" and/or was caused by a failure to train Stokes adequately resulting in a violation the Fresno PD practices, training, and protocols.

104.   Defendant Stokes' testimony in this regard was convenient for the prosecution of Plaintiff at trial but is at stark odds with Defendants' investigative actions.  Defendants' investigation confirms at the time of the crimes and in the months that followed, Defendants did not believe anyone participated in the crimes with RC.

### A. The Accomplice Theory Was Created and Marketed by the Victim's Family.

105.   The catalyst of Defendants' accomplice theory neither was their investigative actions, nor evidence of Plaintiff's involvement.  The catalyst

COMPLAINT FOR DAMAGES

was the dogged promotion of such an event by Caton's daughter and RC's mother, Lavelle Garrett.  RC may have acted completely alone, but that was incomprehensibly unacceptable for his mother, Garrett.  Faced with passively accepting the nightmarish thought that her son, RC, murdered her mother, Ms. Caton, Garrett went bounty hunting and posted a $5,000 reward for the conviction of anyone who may have been an accomplice in what she characterized as RC "savagely" and "brutally" murdering her mother.

107.   If there was an accomplice, it likely was Gene Buchanan, Garrett's nephew, Dean Long (Caton's other grandson and RC's cousin), Gail Goldman, and/or Miguel Sandoval.  Defendant Stokes' failure to investigate these possibilities was "plainly incompetent" and/or was caused by a failure to train Stokes adequately resulting in a violation the Fresno PD practices, training, and protocols.

### B. Buchanan, Long, Goldman, and Sandoval Accomplice Information Was Amply Documented in Fresno PD's Reports.

106.   Defendants' investigation revealed that Gene Buchanan lived with Gail Goldman, RC, Plaintiff, and others in a one-bedroom apartment, and owned a car with Goldman to facilitate RC getting to and from Caton's house, which was over a mile and half away.  Dean Long lived around the corner from Caton and Freiri, was a habitual drug abuser like his cousin RC, and his drug connection coincidentally was Buchanan.  Miguel Sandoval owned a car and was a drug-using acquaintance of RC's.  He was seen with RC in the weeks leading up to the murders, including possibly on the day of the murders, denied knowing RC when interviewed by Defendants Fresno PD

- 36 -

COMPLAINT FOR DAMAGES

MCBREEN & SENIOR
1801 Century Park East, 24th Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

and Stokes, and quite coincidentally, had his car "stolen" by RC to allow RC to flee to San Jose after the murders.

### i. Gail Goldman.

107. On November 8, 1988, at around 11:00 a.m., Garrett could not reach her mother, Marie Caton. Nena Frutos, a neighbor, was *emphatic* that she had seen and spoken to Caton at the store at around noon (perhaps explaining why Garrett could not reach Caton around that time).

108. Valerie Montez, a 15-year-old resident of the home directly east of Caton's residence, was returning home from school, when she passed Caton's home at approximately 4:00 p.m. As she walked past the house, she looked and observed what she thought to be a female standing behind the screen door. At the time, she assumed the person was Ms. Caton, but was not positive of the woman's identity.

109. When Garrett could not reach Caton all afternoon on November 8, she became concerned and went to check on her at approximately 5:30 to 5:45 p.m. The beaten bodies of Freiri and Caton were discovered soon after. Evidence collected from the crime scene suggests that the assaults occurred on the afternoon of November 8, 1988, not on the evening of November 7, 1988, and Valerie Montez likely observed a woman being involved in the crimes at around 4:00 p.m.

110. The coroner who performed the autopsy on Freiri noted that the contents of his stomach indicated that he had eaten just *one to two hours before his death*. At 8:15 p.m. on November 8, 1988, just after the body of Freiri was discovered, Freiri's liver temperature was measured at 87 degrees.

COMPLAINT FOR DAMAGES

At just 11 degrees below normal body temperature, it was highly unlikely that Freiri had died 24 hours earlier after eating dinner.

111.    The foregoing evidence suggests that Caton was alive around noon on November 8, was observed at the store around the time when Garrett began calling her at home, and that she and Freiri were attacked one to two hours after lunch on November 8, 1988, when Montez observed the woman standing, perhaps as a lookout, in the doorway when Garrett could not contact Caton by telephone.  This scenario, supported by the forensic evidence, would result in Freiri's liver temperature being 87 degrees a few hours later.

112.    These facts fully discredit the stories of Goldman and Buchanan, including Plaintiff's involvement as an accomplice.  Moreover, these facts provide Goldman and Buchanan with a motive to implicate Plaintiff and exculpate themselves from their involvement in the crimes with RC with use of their car.

113.    Defendants' disregard of the facts and evidence developed during their earlier investigation was tantamount to the knowing creation of false reports and evidence to be used against Plaintiff to pursue his arrest and secure a conviction and is a violation of his right to due process.  *Napue v. Illinois*, 360 U.S. 264 (1959).  Defendant Stokes' conduct was "plainly incompetent" and/or was caused by a failure to train Stokes adequately resulting in a violation of Fresno PD practices, training, and protocols.

### ii.    Dean Long and Gene Buchanan.

114.    Lavelle Garrett could not open Ms. Caton's front door around 5:30 p.m. on November 8, so she went to summon Dean Long at his nearby house to

MCBREEN & SENIOR
1801 Century Park East, 24th Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

- 38 -
COMPLAINT FOR DAMAGES

accompany her in the dark to Caton's house. Long was found by Garrett at home in his robe at 6:00 p.m.

115. When Long returned with Garrett to Caton's house, his key would not open the front door. So, they walked to the back and found the back gate open and the back door ajar. Despite being in the dark in these "very unusual" circumstances, Long entered through the back door and into an unlit area where he could not see very well. He found Freiri's body, but did not exit in terror and call the police. Rather, he walked around the house and found his incapacitated grandmother in a bedroom. He then announced that Freiri was dead and Caton was alive – remarkable medical acumen for a layperson, in the dark, examining victims covered by sheets, under terrifying circumstances.

116. Later that night at the hospital, Garrett "adamantly" stated to police in response to the attacks that she did not trust her nephew Long; he had drug problems. She was very "frank" in her statements that her nephew Long should be considered a suspect.

117. Long was later questioned by police about his statements to Garrett that he had "seen a couple of stab wounds on [Freiri's] chest" – reflecting that he knew how and where Freiri was stabbed – even though Freiri was found in the dark, under a sheet, face down. Long acknowledged that he did not turn Freiri over, but denied making the statements to Garrett. Defendant Stokes' conduct in responding to these clues was "plainly incompetent" at best, or intentional oversight at worst, and/or it was caused by a failure to train Stokes adequately resulting in a violation of Fresno PD practices, training, and protocols.

MCBREEN & SENIOR
1801 Century Park East, 24th Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

COMPLAINT FOR DAMAGES

MCBREEN & SENIOR
1801 Century Park East, 24th Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

118.   Fresno PD surmised at trial that the attacker was a family member, or someone close to the victims, because the victims' bodies were found covered by sheets.  This premise would inculpate RC and/or Long as the attacker(s), and exculpate Plaintiff as the accomplice.

119.   When Buchanan returned to Fresno months later, he remarkably ended up in Fresno at the market across the street from Caton's very house and saw the posted reward.  In lieu of contacting law enforcement with his claimed information, he went straight to Dean Long, his cocaine customer.  Long then brokered a chat with law enforcement via a relative in the police department.  Buchanan claimed that in the days following the murders, Plaintiff confessed to Goldman and he witnessed it.  This story would provide a payday for Buchanan, Long, and Goldman who provided Buchanan with housing for five years, received rent payments from Buchanan, received her heroin and cocaine from Buchanan, and who was going to share in the reward obtained by the man who listed Goldman on his arrest reports as his "nearest relative or friend" and his "employer."  Again, Defendant Stokes' conduct was "plainly incompetent" and/or intentionally without regard for a search for the truth, and were caused by a failure to train Stokes adequately resulting in a violation the Fresno PD practices, training, and protocols.

120.   Defendants' disregard of the facts and evidence developed during their earlier investigation was tantamount to the knowing creation of false reports and evidence to be used against Plaintiff to pursue his arrest and secure a conviction and is a violation of his right to due process.  *Napue v. Illinois*, 360 U.S. 264 (1959).

- 40 -

COMPLAINT FOR DAMAGES

### iii.   Miguel Sandoval.

121.   Miguel Sandoval was a known acquaintance of RC.  They had been seen hanging out at times in October, 1988.  Defendant Stokes knew this.  RC purchased drugs from Sandoval.  Stokes also knew this.  On November 7, RC was seen with a Mexican male, short in stature with curly hair, which matched Sandoval's description.  Again, Stokes knew this.

122.   Sandoval had a car and resided three miles from the crimes.  Phone records show that Sandoval was at home at 8:55 p.m. on November 7, calling his girlfriend, which was the very same time that RC returned to his residence and packed his bags and left.  None of Sandoval's roommates or friends can attest to his whereabouts on the evening of November 7 before 8:55 p.m.

123.   On November 12, RC purportedly stole Sandoval's car from Ruben Flores, an acquaintance of Sandoval's, who was using the car in a mall parking lot.  RC drove it from Fresno to San Jose, where he ultimately committed suicide in the car.  Sandoval did not report his car stolen, and denied to the police that he knew RC.  Defendant Stokes later determined this to be a lie.

124.   On January 16, 1989, Garrett advised Defendant Stokes that there may be a connection between RC and Sandoval/Flores.  She recalled RC mentioning the name of Victor Riley, an acquaintance of Sandoval's.  On January 20, 1989, Sandoval admitted to Defendant Stokes that he knew RC from a drug sale at Sandoval's apartment, and admitted that Flores told him "Richard" stole the car.  Sandoval initially denied knowing Victor Riley, but later admitted he was an acquaintance.

MCBREEN & SENIOR
1801 Century Park East, 24th Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

- 41 -

MCBREEN & SENIOR
1801 Century Park East, 24th Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

125.   Therefore, Sandoval lied to Defendants Fresno PD and Stokes every time he was questioned about this incident, RC was seen with Sandoval on the days leading up to the crime and possibly the day of the crime, Sandoval has no alibi as to his whereabouts on the evening when the crimes allegedly were committed, RC fled from Fresno to San Jose in Sandoval's car, Sandoval claimed to Fresno PD and Stokes that he didn't know RC, while in fact, RC and Sandoval were drug pals on the date of the crime and when RC "stole" Sandoval's car to flee from Fresno to San Jose.

126.   Defendants' disregard of the facts and evidence developed during their earlier investigation was tantamount to the knowing creation of false reports and evidence to be used against Plaintiff to pursue his arrest and secure a conviction and is a violation of his right to due process.  *Napue v. Illinois*, 360 U.S. 264 (1959).

127.   Defendant Stokes' conduct was "plainly incompetent" and/or an intentional failure to examine the evidence, and was caused by a failure to train Stokes adequately resulting in a violation of Fresno PD practices, training, and protocols.

### iv.   Third Party Forensic Evidence.

128.   Neither the hair of RC, Long, Buchanan, Goldman, nor Sandoval was checked for a match with the hair found in Freiri's left hand.  The hair did not match Plaintiff, and RC was bald.

129.   Neither the blood of Long, Buchanan, Goldman, nor Sandoval was typed for a match with the blood from the telephones, the handle of the knife, the knife blade, the matter on the blade, the dollar bills found in the

- 42 -

bedroom, the broken piece of cane, the handle of the cane, or the other piece of cane.  That blood did not match the blood type of Plaintiff.

130.    Despite Defendants' claim that no usable latent fingerprints of any person were anywhere in the house, it is unfathomable to suggest that Long's prints were not there after he entered the house in the dark with his aunt and Caton's daughter, Garrett, and presumably touched enough things in the house to make accurate examinations of Freiri and Caton regarding whether they were alive in two separate rooms in the house.  It is unfathomable to suggest that prints were not on the blood-stained telephones found moved to the living room.  Even the Defendants touched and carried the telephones around, contaminating the crime scene, and certainly leaving their own prints on the phones.

131.    Coupled with the creation of a false report regarding the fingerprints found on the blind purportedly from the Harvard Street apartment, there is no credibility of Defendants' fingerprint assessments.  Defendant Stokes' conduct was "plainly incompetent" and/or intentionally wrong, and was caused by a failure to train Stokes adequately resulting in a violation of Fresno PD practices, training, and protocols.

132.    Defendants' disregard of the facts and evidence developed during their earlier investigation and failure to make forensic examinations based thereon was tantamount to the knowing creation of false reports and evidence to be used against Plaintiff to pursue his arrest and secure a conviction and is a violation of his right to due process.  *Napue v. Illinois*, 360 U.S. 264 (1959).

COMPLAINT FOR DAMAGES

MCBREEN & SENIOR
1801 Century Park East, 24th Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

**6.    DEFENDANTS DEPORTED MATERIAL WITNESS AND POSSIBLE ACCOMPLICE RUBEN FLORES TO FACILITATE ITS PROSECUTION OF PLAINTIFF.**

133.    RC was purchasing cocaine from Ruben Flores in September 1988. Flores advised RC in September that he could make available large quantities of cocaine and other drugs if he was an interested buyer.

134.    Lacricia Bruce, RC's cousin, recalls seeing RC in the middle of October, 1988, with a Mexican male, medium build, approximately 5'7" or 5'8". Defendant Stokes showed Bruce a photo of Miguel Sandoval, Ruben Flores' roommate, and Bruce believed that it was the individual she had seen with RC on "a couple of occasions" in October.  Defendant Stokes did not ask Bruce whether she knew Ruben Flores, or show Bruce a photo of Flores and make the same inquiry.

135.    Defendant Stokes' conduct was "plainly incompetent" and/or was caused by a failure to train Stokes adequately resulting in a violation of Fresno PD practices, training, and protocols.

136.    On the morning of November 7, 1988, the date Defendants claim the crimes occurred, RC was seen by his employer, Theresa Helmseth, with a Mexican male, short in stature with curly hair.  Defendant Stokes knew this. On November 30, 1988, Defendant Stokes showed Helmseth a photo of Miguel Sandoval, and Helmseth stated that she had never seen the person before.  Remarkably, Defendant Stokes did not show Helmseth a photo of Ruben Flores and make the same inquiry.  Defendant Stokes' conduct was "plainly incompetent" and/or was caused by a failure to train Stokes adequately resulting in a violation of Fresno PD practices, training, and protocols.

MCBREEN & SENIOR
1801 Century Park East, 24th Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

COMPLAINT FOR DAMAGES

137.   Flores was with RC after RC had fled from his Harvard Street apartment following the crimes.  Flores was the very last person to be with RC as he fled from Fresno on November 12 and drove to San Jose.  Flores provided RC with a car to flee.

138.   After Flores gave RC his car to enable him to flee, Miguel Sandoval immediately became concerned because the car was registered in Sandoval's name and it would link him to RC, who was fleeing from the murders.  So, Sandoval reported the car stolen.  Both Sandoval and Flores knew who had the car, but they did not report that.  When Defendant Stokes ultimately inquired whether the car was "lent" to RC, Sandoval immediately said that was "impossible" because he had reported the car stolen.

139.   Sandoval claimed that Flores (who was in the process of buying the car) was using the car, and that it was stolen from the mall parking lot while Flores was inside the mall.  Sandoval claims that Flores later changed the version of the story and claimed that he in fact was car-jacked in the parking lot at gun point.  Flores claimed that he lied to Sandoval about the events, so Sandoval would not be upset that Flores failed to attempt to fight off the car-jacker who was brandishing a gun and threatening to shoot Flores.  The story strains credulity and Defendant Stokes failed to investigate the matter.  Defendant Stokes' conduct was "plainly incompetent" and/or intentional malfeasance and was caused by a failure to train Stokes adequately resulting in a violation of Fresno PD practices, training, and protocols.

140.   Sandoval never reported the car stolen at gun-point, which certainly would have raised the profile of the purported stolen car crime, and never

- 45 -

COMPLAINT FOR DAMAGES

MCBREEN & SENIOR
1801 Century Park East, 24th Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

reported RC as the thief, which would have heightened the chances of apprehension of a fleeing double homicide suspect.

141. Flores confirmed to Defendant Stokes, when shown a photo of RC on November 29 (after RC was dead), that it was in fact RC who left the mall in his car. Flores lied again, however, and denied knowing RC.

142. On January 2, 1989, seven weeks after the crimes, Lavell Garrett, RC's mother and victim Caton's daughter, advised Defendant Stokes that she had reviewed all the police reports generated in the case, and that she believed there may be a "connection" between RC and Flores, and between RC and Flores' roommate, Miguel Sandoval.

143. On January 16, 1989, Defendant Stokes reopened his investigation when he learned from Fresno PD's narcotics department that Flores and RC were in fact acquainted, and that Flores previously had lied to Stokes by telling him that he didn't know RC. In fact, Flores was an acquaintance of RC's, had sold RC cocaine, had advised RC that he could secure him large quantities of cocaine and other drugs, and on November 12, four days after the crimes, gave RC a car to flee from Fresno. Indeed, Ruben Flores knew RC quite well, and facilitated his get-a-way after RC committed a double murder.

144. Notwithstanding, Defendant Stokes unreasonably failed to return to RC's employer, Theresa Helmseth, and show her a photo of Flores to determine whether he was the Mexican male, short in stature with curly hair, that she saw with RC on the morning of November 7, 1988. Defendant Stokes never checked the forensic evidence taken from the crime scene – the hair, blood, and fingernail scrapings – and had it compared to Flores for a match. Defendant Stokes' conduct was "plainly incompetent" and/or was

- 46 -

MCBREEN & SENIOR
1801 Century Park East, 24th Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

caused by a failure to train Stokes adequately resulting in a violation of Fresno PD practices, training, and protocols.

145.   On January 20, 1989, Sandoval admitted to Defendant Stokes that he knew RC, and admitted that Flores told him "Richard" stole the car. Defendant Stokes believed that Sandoval's repeated references to RC as "Richard" indicated that they had a "closer relationship" than he was willing to claim.

146.   On February 22, 1989, after Defendant Stokes had arrested Plaintiff, after Stokes had asserted that Plaintiff was involved in the crimes as an accomplice, after Stokes had adopted the stories of Buchanan and Goldman (to the extent that there were any consistencies), Stokes interviewed Ruben Flores, who by then, was in jail.  Flores denied telling Sandoval that "Richard stole the car," and continued to deny that he knew RC, until Stokes advised him that Sandoval told him otherwise.

147.   Flores was unable to recall his activities on November 7 or 8, 1988.

148.   Defendants' disregard of the facts and evidence developed during their earlier investigation was tantamount to the knowing creation of false reports and evidence to be used against Plaintiff to pursue his arrest and secure a conviction and is a violation of his right to due process. *Napue v. Illinois*, 360 U.S. 264 (1959).

### 7.   DEFENDANTS IMPROPERLY DEPORTED A MATERIAL WITNESS.

149.   Defendants then made Ruben Flores, a material witness, unavailable by deportation.  Flores certainly had material information regarding RC's drug use, drug addiction, drug purchases, behavior in the months prior to the

COMPLAINT FOR DAMAGES

crimes, and flight from the crimes; he also was a possible alternative suspect in the case.

150.    When Defendants purportedly were investigating the subject crimes, Flores repeatedly lied to them, thereby inhibiting its pursuit of information and facts.  For months after the crimes, he claimed that he did not know RC. He claimed RC stole his car, but there is no evidence that the car was stolen, other than Flores saying that it was.  And that claim was packed with lies as well.  First, Flores claimed the car simply disappeared while he was in the mall.  Then he claimed it was taken from him at gunpoint, but he failed to mention that the person who had the car was an acquaintance.

151.    Flores' behavior and his connection with RC during the weeks prior to the crimes, and while RC was fleeing from the crimes, was material to Plaintiff's defense.  *United States v. Valenzuela-Bernal,* 458 U.S. 858, 873 (1982) (due process mandates dismissal of charges when defendant makes a plausible showing that the deported witness's testimony would have been material and favorable to the defense, in ways not merely cumulative to the testimony of available witnesses); *United States v. Leal-Del Carmen,* 697 F.3d 964, 969 (9th Cir. 2012) ("The government undermined [defendant's] opportunity to present a complete defense by deporting a witness it knew could give exculpatory evidence.").  Defendants violated Plaintiff's right to due process prior to his trial in this regard.

152.    Prior to trial, Flores was deported.  Sandoval was called by the defense to testify regarding statements allegedly made by RC during the purported carjacking.  Considering the statistical improbability that RC would "just so happen" carjack a prior drug-buddy, and particularly considering Flores' false

MCBREEN & SENIOR
1801 Century Park East, 24th Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

- 48 -

COMPLAINT FOR DAMAGES

statements to Fresno PD, there were clear questions to be asked of Flores before and during trial, even if Defendant Stokes refused to conduct any reasonable investigation regarding Flores. *See Leal-Del Carmen*, 697 F.3d at 970 ("[I]f the government interviews the witness or has other information suggesting that he could offer exculpatory evidence, the government may not deport him without first giving defense counsel a chance to interview him.").

153.  Flores was a possible alternative suspect in the crimes and clearly a material witness to Plaintiff's defense.  Defendants' deportation of Flores denied Plaintiff his right to due process and to a fair trial under the Fifth and Fourteenth Amendments.

## PLAINTIFF COLIN DICKEY'S DAMAGES

154.  Plaintiff was convicted of special circumstances murder and sentenced to death in 1991.

155.  Plaintiff was delivered to San Quentin State Prison on or about April 21, 1992 to be housed by the California Department of Corrections ("CDC") on death row as a condemned prisoner.

156.  Upon Plaintiff's arrival at San Quentin State Prison, the prison was on lock down because CDC was in the process of executing inmate Robert Alton Harris in its gas chamber.

157.  As a condemned prisoner, Plaintiff was denied regular inmate housing, liberties, privileges, and programing that the other ~25,000 California inmates received who are convicted of murder.

158.  As a condemned prisoner, Plaintiff was denied parole eligibility and programming.  As a result, Plaintiff never was on track to be reviewed for,

MCBREEN & SENIOR
1801 Century Park East, 24th Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

- 49 -

qualified for, or released on parole, as all non-special circumstance inmates are.

159.    As a condemned prisoner, Plaintiff was denied the opportunity to leave his cell without being shackled.

160.    As a condemned prisoner, all legal visits or visits by family or friends were conducted in a room with a shared wall to CDC's execution chamber.

161.    As a condemned prisoner, Plaintiff was forced to be physically present in an adjacent cell and to be consciously present while CDC employed its execution protocol on thirteen inmates who were executed by the CDC.

162.    As a condemned prisoner, Plaintiff's liberty was deprived, controlled, and handled by, among others, executioners from CDC's execution team.

163.    As a condemned prisoner, Plaintiff was denied the opportunity to eat a meal with another human being for over 34 years.

## CLAIM I

### 42 U.S.C. § 1983 Malicious Prosecution in Violation of the Fourth, Fifth, and Fourteenth Amendments Against the Individual Defendants

164.    Plaintiff repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

165.    The Individual Defendants, surviving or sued through the Executors and/or Administrators of their Estates, individually and/or in concert with each other and others unnamed, acted knowingly, willfully, intentionally, and with actual malice to initiate and/or to continue criminal proceedings against Plaintiff, without probable cause to believe that Plaintiff was guilty of special circumstances or could be successfully prosecuted, and caused him to be deprived of his liberty, in violation of his rights under the Fourth, Fifth,

MCBREEN & SENIOR
1801 Century Park East, 24th Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

COMPLAINT FOR DAMAGES

Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

166. The special circumstances proceedings terminated in Plaintiff's favor.[1]

167. By virtue of the foregoing, and pursuant to 42 U.S.C. § 1983, the Individual Defendants, personally or through their Estates, are liable for the violations of Plaintiff's constitutional rights and his resulting injuries.

**CLAIM II**

**42 U.S.C. § 1983 Unreasonable Seizure under the Fourth Amendment, and Denial of Due Process and a Fair Trial under the Fifth, Sixth, and Fourteenth Amendments, Due to the Fabrication of False or Misleading Evidence by the Individual Defendants**

168. Plaintiff repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

169. The Individual Defendants, surviving or sued through the Executors and/or Administrators of their Estates, acting individually and/or in concert with each other and with others, acted deliberately, willfully, recklessly, and/or with deliberate indifference to the truth, to fabricate or manufacture false or misleading police reports, witness statements, and a Criminal Court complaint (collectively, the "Fabricated Evidence").

---

[1] Plaintiff continues to challenge his murder conviction and sentence. As the record stands, there now is no jury finding of *inter alia* intent to kill, a required element to be convicted as an aider and abettor of felony murder under state law. On May 31, 2023, the Ninth Circuit order Plaintiff to be granted a new special circumstances trial or to be sentenced in accordance with state law. That has not occurred based upon the record and Defendant Fresno DA's decision to not grant Plaintiff a new trial on the special circumstance allegations.

- 51 -

COMPLAINT FOR DAMAGES

MCBREEN & SENIOR
1801 Century Park East, 24th Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

170. The Individual Defendants forwarded, or caused to be forwarded, the Fabricated Evidence to prosecutors at Fresno DA, intending that it be used against Plaintiff during a criminal prosecution.

171. The Individual Defendants knew that the Fabricated Evidence, if considered by a jury, would be likely to influence a jury's decision at trial to convict Plaintiff.

172. As a result of the Individual Defendants' conduct in forwarding, or causing to be forwarded, the Fabricated Evidence to Fresno DA, prosecutors in that office initiated and continued a criminal prosecution of Plaintiff, and he lost his liberty.

173. The Individual Defendants' conduct violated Plaintiff's right to be free from unreasonable seizure, as guaranteed by the Fourth Amendment to the United States Constitution, and his rights to procedural and substantive due process and a fair trial, as guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

174. The above misconduct was outrageous and shocking to the conscience.

175. By virtue of the foregoing, the Individual Defendants are liable to Plaintiff, pursuant to 42 U.S.C. § 1983, for the violation of his constitutional rights and his resultant injuries according to proof.

MCBREEN & SENIOR
1801 Century Park East, 24th Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

- 52 -

COMPLAINT FOR DAMAGES

**CLAIM III**

**42 U.S.C. § 1983 Unreasonable Seizure under the Fourth Amendment, Denial of Due Process and a Fair Trial under the Fifth, Sixth, and Fourteenth Amendments, and Denial of Reasonable Bail under the Eighth Amendment, Due to the Pretrial Withholding of Favorable Evidence Likely to Result in Plaintiff's Release from Custody ("*Russo* Claim") by the Individual Defendants**

176.   Plaintiff repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

177.   Following the initiation of Plaintiff's prosecution with the filing of an Information and a Complaint, the continuation of the charges was subject to a preliminary hearing, at which a judge determines whether there was probable cause to prosecute, and a proceeding which would decide whether the evidence supported formally charging Plaintiff and binding him over for trial.

178.   Under California law, as well as the Eighth and Fourteenth Amendments to the United States Constitution, the court, following the filing of charges, was required, upon application of the defendant, to consider whether to fix a reasonable bail so that the defendant could obtain his release.

179.   Under California law, the strength of the prosecution's case was a significant factor for a court in determining whether to fix a reasonable bail and the amount of such bail.

180.   Despite knowing this, the Individual Defendants withheld, or caused to be withheld, from Fresno DA, Plaintiff and his lawyer, and the court exculpatory and impeachment evidence and other evidence favorable to the defense that completely undermined the prosecution's case.

COMPLAINT FOR DAMAGES

MCBREEN & SENIOR
1801 Century Park East, 24th Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

181.   Had such evidence been timely disclosed, the charges against Plaintiff likely would not have survived the preliminary hearing or the determination by the court, and Plaintiff would have been released on his own recognizance or on a reasonable bail.

182.   The failure to make timely disclosure of such obviously significant evidence undermining the entire case caused Plaintiff to be unnecessarily and unreasonably deprived of his liberty.

183.   This conduct was shocking to the conscience.

184.   It violated Plaintiff's constitutional rights to be free of unlawful or unreasonable seizure under the Fourth and Fourteenth Amendments, to reasonable bail under the Eighth and Fourteenth Amendments, to a fair trial under the Sixth and Fourteenth Amendments, and to due process of law under the Fifth and Fourteenth Amendments.

185.   By virtue of the foregoing, the Individual Defendants or their Estates are liable, pursuant to 42 U.S.C. § 1983, for the violation of Plaintiff's constitutional rights and his resultant injuries.

### CLAIM IV

**42 U.S.C. § 1983 Denial of Due Process and a Fair Trial under the Fifth, Sixth, and Fourteenth Amendments by Withholding Evidence Favorable to the Defense ("*Brady* Claim") by the Individual Defendants**

186.   Plaintiff repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

187.   At all relevant times, Plaintiff had a right—under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, and *Brady v. Maryland*, 363 U.S. 83 (1963) and its progeny—to timely disclosure to him,

- 54 -

by the prosecution, of all evidence in its possession, custody or control that was favorable to his defense, either because it tended to show his innocence, tended to impeach the credibility of the prosecution's witnesses against him, or both ("*Brady* material").

188.   In furtherance of this right, police officers, including the Individual Defendants, surviving or sued through the Executors and/or Administrators of their Estates, had a duty to timely disclose, or to ensure the timely disclosure of, all potential *Brady* material to Fresno DA so that it could decide what to disclose to the defense.

189.   The Individual Defendants violated this duty by knowingly, willfully, intentionally, recklessly, and/or negligently failing to timely disclose to the prosecutors in charge of Plaintiff's criminal prosecution numerous items of "*Brady*" material, including documents and unrecorded information, including but not limited to the material enumerated above, and elsewhere in this Complaint, and by destroying their notes.

190.   The undisclosed *Brady* material was material to the outcome of the trial at which Plaintiff was convicted.  But for the Individual Defendants' failure to disclose or cause the disclosure of the *Brady* material, there is a reasonable likelihood that Plaintiff would have been acquitted or otherwise received a more favorable outcome to his trial.

191.   By virtue of the foregoing, the Individual Defendants or their Estates are liable, pursuant to 42 U.S.C. § 1983, for the violation of Plaintiff's constitutional rights and his resultant injuries.

MCBREEN & SENIOR
1801 Century Park East, 24th Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

- 55 -
COMPLAINT FOR DAMAGES

MCBREEN & SENIOR
1801 Century Park East, 24th Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

**CLAIM V**

**42 U.S.C. § 1983 and *Monell* Municipal Liability for the Conduct of Employees of the Fresno PD Against the City of Fresno**

192.   Plaintiff repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

193.   At all relevant times, the Fresno Chief of Police, detectives, and other police officers employed by the Fresno PD were agents and employees of the Defendant City.

194.   Under the principles of municipal liability for federal civil rights violations, the City's Chief of Police or his authorized delegates, during all times relevant to this Complaint, had final responsibility for training, instructing, supervising, and disciplining police officers and other employees of the Fresno PD with respect to the investigation and prosecution of criminal matters, including homicides.

195.   The areas in which the Chief of Police, or his authorized delegates, were responsible for training, instructing, supervising, and disciplining police officers and other employees of the Fresno PD included but were not limited to:

(a) the constitutional obligation, pursuant to the Fourth, Fifth, and Fourteenth Amendments to the Constitution, not to initiate or continue a prosecution, and to cause a criminal defendant's deprivation of liberty, without probable cause to believe he or she has committed a crime;

(b) the constitutional obligation, pursuant to the Fourth, Fifth, Sixth, and Fourteenth Amendments, not to fabricate or manufacture evidence, including the coercion of confessions and witness statements through illegal detentions

- 56 -

COMPLAINT FOR DAMAGES

without probable cause, threats, lies, or trickery and the preparation of false or materially misleading or incomplete reports, for use against criminal suspects and defendants in criminal prosecutions and trials;

(c) the constitutional obligation, pursuant to the Fourth, Fifth, Sixth, and Fourteenth Amendments, to make timely disclosure of evidence favorable to the defense to the prosecution for disclosure in turn to a criminal defendant for use during pretrial and trial proceedings at which the defendant's liberty is at stake; and

(d) the constitutional obligation not to deport material witnesses who may be a suspect or provide testimony that would have been material and favorable to the defense.

196.   During all times material to this Complaint, the City, through its policymaking officials in the Fresno PD, owed a duty to the public at large and to Plaintiff to implement policies, procedures, training, discipline, customs, regulations, and practices sufficient to prevent, deter, and avoid conduct by Fresno PD employees that would result in the violation of the above-mentioned constitutional obligations.

197.   During all times material to this Complaint, these policymakers, including the Chief of Police, to whom policymaking responsibilities for homicide investigations had been delegated, knowingly and intentionally breached, or were deliberately indifferent to, this duty.

198.   Furthermore, these policymakers created substantial incentives for their employees to commit the above-described constitutional violations by pressuring police officers, particularly homicide detectives handling high-

MCBREEN & SENIOR
1801 Century Park East, 24th Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

- 57 -

profile investigations, to close cases and initiate prosecutions through coercion, trickery, falsification of reports, and suppression of evidence.

199.    The aforesaid deliberate or de facto policies, procedures, practices, and/or customs (including the failure to properly instruct, train, supervise, and/or discipline employees) were implemented or tolerated by policymaking officials for the Defendant City who knew, or should have known:

(a) to a moral certainty that such policies, procedures, practices, and/or customs concern issues that regularly arise during criminal investigations and prosecutions;

(b) that such issues present Fresno PD employees with difficult choices of the sort that instruction, training, supervision, and discipline will make less difficult;

(c) that Fresno PD employees facing such issues have strong incentives to make the wrong choices, especially given the pressure placed on Fresno PD employees to make arrests, close cases, and secure indictments and convictions;

(d) that the wrong choice by Fresno PD employees concerning such issues will frequently cause the deprivation of the constitutional rights of an accused person and cause him constitutional injury; and

(e) that Fresno PD employees had a history of making wrong choices in such matters.

200.    At the time of Plaintiff's arrest and prosecution, Fresno PD policymaking officials were on notice of the risk of misconduct by Fresno PD employees that would violate the constitutional obligations identified herein.

- 58 -

COMPLAINT FOR DAMAGES

201.   City policymaking officials were on notice based in part on numerous decisions of the United States Supreme Court, the United States Court of Appeals and its district courts, and the California courts discussing the constitutional obligations of police officers during criminal investigations and prosecutions.

202.   City policymaking officials were on notice based on the inherent obviousness of the need to train, supervise, and discipline police officers with respect to their constitutional obligations to counteract the pressure on such officers to close cases and to obtain arrests and convictions.

203.   Indeed, Fresno PD policymakers knew, prior to and during the period of the Caton and Freiri investigation, that numerous Fresno PD officers had orchestrated an arrest and conviction in high-profile murder cases using the same deceptive, coercive, and dishonest practices that the entire Homicide Detectives Unit then used in this case.

204.   Notwithstanding their awareness of the widespread use of such tactics by the Fresno PD, Fresno PD policymaking officials failed to adequately instruct, train, discipline and supervise police officers with respect to their obligations, *inter alia*: (1) to disclose, to the defense or to prosecutors, evidence impeaching the credibility of prosecution witnesses or tending to exculpate criminal suspects or defendants; (2) to make a record of coercion or inducement of witnesses and of witnesses' prior inconsistent statements; (3) to preserve rather than destroy their handwritten notes; (4) to refrain from fabricating evidence, including by using coercion or deception to obtain false confessions and witness statements and preparing false, materially

MCBREEN & SENIOR
1801 Century Park East, 24th Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

- 59 -

misleading, or incomplete reports; and (5) to refrain from initiating or continuing a prosecution without probable cause.

205.   The issues of whether to preserve and to disclose evidence favorable to the defense to prosecutors or to the defense, how to ensure that evidence is not fabricated through false confessions and witness statements and false, misleading, or incomplete reports, and how to ensure that a prosecution is not initiated or continued without probable cause regularly arise in criminal investigations and prosecutions.

206.   Nevertheless, the Fresno PD provided no or plainly inadequate *Brady*-related training; provided no or plainly inadequate training concerning making and preserving a record of information that was favorable to a criminal suspect or defendant; had no policies at all, or at least no policies that were adequately made known to detectives, requiring disclosure of *Brady* material; and did not discipline officers who failed their constitutional duty to disclose such information to prosecutors.

207.   Similarly, the Fresno PD provided no or plainly inadequate training on interview and interrogation protocols to ensure the truthfulness of confessions and witness statements; affirmatively encouraged officers to illegally detain witnesses and suspects for interrogation and use or close their eyes to coercive interview and interrogation tactics likely to lead to false confessions and witness statements; provided no or plainly inadequate training on preparing reports that are truthful, accurate, and complete; had no policies at all, or at least no policies that were adequately made known to detectives, discouraging officers from using coercive interview and interrogation tactics, including the unlawful detention of witnesses and

MCBREEN & SENIOR
1801 Century Park East, 24th Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

- 60 -

COMPLAINT FOR DAMAGES

suspects, without probable cause, likely to lead to false confessions and witness statements; encouraged or at least tolerated detectives' practice to refrain from making a record of information favorable to suspects and defendants and to destroy their notes, and did not discipline officers who fabricated evidence by coercing false confessions and witness statements and preparing false, materially misleading, or incomplete reports.

208.   Indeed, rather than provide formal training on lawful interrogation techniques, the Fresno PD endorsed on-the-job training by detectives who had a history and practice of unlawfully coercing witnesses, thereby perpetuating such practices and creating an atmosphere in which detectives assumed either that such techniques were appropriate or that, even if inappropriate or unlawful, they would get away with them without personal consequence to them.

209.   The Fresno PD also provided no or plainly inadequate training on how to ensure that probable cause exists to initiate or continue a prosecution, including ensuring that the prosecution is not initiated or continued based on the use of manufactured or otherwise unreliable evidence.

210.   Fresno PD policymaking officials had, before Plaintiff's arrest, issued no provision or other written directive to officers concerning when, if at all, to disclose information favorable to a criminal suspect or defendant to prosecutors.

211.   With deliberate indifference to such misconduct, Fresno PD policymaking officials failed to take adequate steps to train, supervise, or discipline Fresno PD employees to prevent or deter such constitutional violations from occurring.

MCBREEN & SENIOR
1801 Century Park East, 24th Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

- 61 -

212.   As a result of the foregoing, at the time of the investigation of the Caton/Freiri murders, it was the policy, custom or practice of Fresno PD detectives to coerce false statements from suspects and witnesses, inherently vulnerable drug addicts, through unlawful investigatory detentions without probable cause and other means, to prepare false or misleading investigative reports, to fail to document information that was favorable to suspects and defendants or to destroy their notes containing such information, and to withhold evidence and information favorable to a criminal suspect or defendant from prosecutors.

213.   Additionally, detectives were encouraged to engage in such illegal activities by their knowledge that it would be at the very least tolerated and excused by Fresno PD policymakers for whom closing high-profile cases with arrests was the priority.

214.   This is apparent from the knowing participation in such illegal activities, during the Caton/Freiri investigation by Defendant Stokes who lied repeatedly to the jury at trial.

215.   That the entire Homicide Detectives Unit knowingly participated in fabricating a case against Plaintiff, documenting their fabricated case through a series of false or misleading investigative reports, omitting information favorable to Plaintiff from their reports, destroying their notes, failing to pursue known and obvious leads and evidence regarding other suspects involved in the crimes, and withholding information favorable to a criminal suspect or defendant from the prosecutors, proves the existence of an anything-goes culture of illegality that policymakers' indifference to such

MCBREEN & SENIOR
1801 Century Park East, 24th Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

- 62 -

COMPLAINT FOR DAMAGES

misconduct predictably had wrought and that such misconduct was, at that time, the policy, custom and practice of the Fresno PD.

216.   The aforementioned unconstitutional or deliberately indifferent policies, procedures, training, discipline, customs, regulations, and/or practices of the Fresno PD were a direct, foreseeable, proximate, and/or substantial cause of the violations of Plaintiff's federal constitutional rights in this case by employees of the Fresno PD and his resulting injuries.

217.   By virtue of the foregoing, the Defendant City is liable for the violation of Plaintiff's constitutional rights pursuant to 42 U.S.C. § 1983 and his resultant injuries.

## CLAIM VI

**42 U.S.C. § 1983 and *Monell* Municipal Liability Against the County of Fresno for the Misconduct of Prosecutors**

218.   Plaintiff repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

219.   The Fresno DA and authorized delegates, at all relevant times, had final authority with respect to the training, supervision, discipline, and overall management of personnel employed by or assigned to the office with respect to all functions, including the investigation and prosecution of criminal cases, and constituted County policymakers for whose actions or omissions the County is liable.

220.   The Fresno DA, at all relevant times, was and is an elected officer of the County, and was and is substantially funded out of the County's budget.

221.   The Fresno DA is an agent and employee of Defendant Fresno County.

COMPLAINT FOR DAMAGES

MCBREEN & SENIOR
1801 Century Park East, 24th Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

MCBREEN & SENIOR
1801 Century Park East, 24th Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

222. The County, at all relevant times, was liable for torts committed by County officers and employees, including the Fresno DA and its employees.

223. The County represents such officers and employees in judicial proceedings and indemnifies them because they are County officials.

224. At the time of Plaintiff's criminal trial, as a criminal defendant, he was entitled, under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution, to timely disclosure of all material information that was in the actual or constructive possession, custody, or control of the Fresno DA and that was favorable to the defense, including, but not limited to, exculpatory information that tended to contradict the prosecution's case or otherwise show he was innocent, and impeachment information that tended to undercut the credibility of the witnesses against him, known as "*Brady* material."

225. The prosecution was constitutionally required to disclose *Brady* material as soon as reasonably possible regardless of whether the defense had made a specific request for it.

226. The prosecution was constitutionally required to find out about and disclose such information, whether it was in its actual possession or in the possession of any police department that had been involved in the investigation or prosecution of the matter.

227. This was a continuing obligation even after a conviction at trial, such as during proceedings brought by a convicted defendant challenging the fairness of his conviction.

228. While the right to timely disclosure of *Brady* material was intended to guarantee the fairness of a criminal trial, the prosecution also had an

COMPLAINT FOR DAMAGES

obligation under the Fourth, Fifth, Sixth and Fourteenth Amendments to the United States Constitution to disclose evidence favorable to the defense early in a criminal prosecution, where it was so clearly relevant to whether the prosecution should continue, or the defendant should be released on bail, that the suppression of it would shock the conscience.

229.    A prosecutor also has a constitutional obligation, at all stages of a criminal prosecution, not to rely on, present, create, or fail to correct false or misleading evidence or argument under *Napue v. Illinois*, 360 U.S. 264 (1959).

230.    The suppression of evidence favorable to the defense from the court during a preliminary hearing or bail hearing, or from a court deciding whether to hold the defendant over for a trial, and from a trial jury, likely would leave an impermissibly false or misleading impression with the fact finder about the strength of the evidence supporting the prosecution's case and about the defendant's guilt.

231.    A prosecutor also has a constitutional obligation to prevent the deportation of a material witness who may be a suspect or provide testimony that would have been material and favorable to the defense.

232.    The Fresno DA had an obligation to oversee and manage the staff and attorneys in the office, including those involved in this prosecution, regarding their health and suitability to conduct constitutional prosecutions. Prosecuting attorneys suffering from alcohol or drug addictions, such as in this case, were required to be taken off high pressure and stressful capital or felony prosecutions to ensure clear thinking and conformance with constitutional obligations and standards.  Moreover, reasonable disciplinary

MCBREEN & SENIOR
1801 Century Park East, 24th Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

- 65 -

actions, suspensions, leave of absences, and/or terminations were required for its attorneys suffering from such addictions. The Fresno DA and his designated senior level agents were aware that the Defendant assigned to prosecute this case was violating the law by driving under the influence of alcohol and/or drugs at levels that were illegal and dangerous to the community; that the Defendant was impaired by alcohol or drugs while making decisions, exercising discretion, and/or making judgment calls on constitutional obligations in prosecuting this case; that his temperament caused him, in his own words, to become "unglued," and be "lifted [] right up out of my chair" in anger at various times during the prosecution of this case, and to shout at in order to intimidate prosecution witnesses; and that the Defendant's integrity was impugned by his addictions.

233. The Fresno DA, reflecting the Office's ongoing disregard for these constitutional obligations, deprived Plaintiff of his constitutional rights to due process and a fair trial and to be free from unreasonable seizure and was a substantial cause of Plaintiff's constitutional injuries.

234. Under the principles of municipal liability for federal civil rights violations, at all relevant times, the Fresno DA had final managerial responsibility for establishing lawful policies of the office and for training, instructing, supervising, and disciplining attorneys and other employees of the office regarding their constitutional obligations.

235. Nevertheless, at the time of Plaintiff's trial, the Fresno DA maintained unlawful policies, customs, or practices, and disregarded violations of fair trial rights, all of which were a substantial cause of the violations of his constitutional rights and to his damages.

MCBREEN & SENIOR
1801 Century Park East, 24th Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

- 66 -
COMPLAINT FOR DAMAGES

236. The Fresno DA, as policymaker for the office and the County, encouraged such violations to occur through the policy of deliberate indifference to them.

237. Policymakers' deliberate indifference created an anything-goes or winning-is-everything atmosphere, which was a substantial cause of the violation of Plaintiff's constitutional rights and of his injuries and damages.

238. The aforesaid policies, procedures, regulations, practices, and/or customs of the Fresno DA were, collectively and individually, a substantial factor in bringing about the aforesaid violations of Plaintiff's rights under the Constitution and laws of the United States and in causing his damages.

239. By virtue of the foregoing, the Defendant County is liable for the violation of Plaintiff's constitutional rights pursuant to 42 U.S.C. § 1983 and his resultant injuries.

**CLAIM VII**

**Municipal Liability Against the City of Fresno for Its Negligent Failure to Properly Hire, Train, Supervise and Discipline the Fresno PD Detectives Who Investigated Plaintiff and Caused His Arrest and Prosecution**

240. Plaintiff repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

241. By virtue of the foregoing, the Defendant City is liable to Plaintiff because of its intentional, deliberately indifferent, careless, reckless, and/or negligent failure to adequately hire, train, supervise, and discipline its agents, servants and/or employees with regard to their aforementioned duties, which was a substantial cause of the Individual Defendants' wrongful conduct and the injuries suffered by Plaintiff.

MCBREEN & SENIOR
1801 Century Park East, 24th Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

- 67 -

COMPLAINT FOR DAMAGES

**CLAIM VIII**

**Municipal Liability Against the County of Fresno for Its Negligent Failure to Properly Hire, Train, Supervise and Discipline the Fresno DA's Prosecutors Who Investigated and/or Prosecuted Plaintiff and Caused His Wrongful Prosecution and Conviction**

242.   Plaintiff repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

243.   By virtue of the foregoing, Defendant Fresno County is liable to Plaintiff because of its intentional, deliberately indifferent, careless, reckless, and/or negligent failure to adequately hire, train, supervise, and discipline its agents, servants and/or employees with regard to their aforementioned duties, which was a substantial cause of the wrongful conduct and of the injuries that were suffered by Plaintiff.

**CLAIM IX**

**Negligent Infliction of Emotional Distress**
**(Individual Defendants and Defendants City and County of Fresno)**

244.   Plaintiff repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

245.   The Individual Defendants breached a duty of care owed to Plaintiff, which unreasonably endangered his physical safety and caused him to fear for his physical safety.

246.   Defendants' conduct was extreme and outrageous.

247.   Defendants' conduct caused Plaintiff to suffer serious bodily injuries in county jail and/or prison and severe emotional distress.

248.   Defendants City and County are liable under the doctrine of respondeat superior.

- 68 -

COMPLAINT FOR DAMAGES

MCBREEN & SENIOR
1801 Century Park East, 24th Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

**PRAYER FOR RELIEF**

WHEREFORE, Mr. Dickey demands judgment against Defendants as follows:

1.     Compensatory damages for the damages described above of not less than $68,000,000;

2.     Punitive damages of not less than $34,000,000;

3.     Reasonable attorneys' fees, together with costs and disbursements, under 42 U.S.C. § 1988 and the inherent powers of this Court;

4.     Pre-judgment interest as allowed by law; and

5.     Such other and further relief as this Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a jury trial on all issues so triable.

DATED: May 30, 2025                         McBREEN & SENIOR

By:  _____
DAVID A. SENIOR
ANN K. TRIA
Attorneys for Plaintiff
COLIN R. DICKEY

MCBREEN & SENIOR
1801 Century Park East, 24th Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

- 69 -

COMPLAINT FOR DAMAGES