**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| COLIN R. DICKEY, | Case No. 1:25-cv-01829 JLT EPG |
| Plaintiff, | ORDER GRANTING MOTIONS TO DISMISS WITH LEAVE TO AMEND |
| v. | (Docs. 62, 65) |
| COUNTY OF FRESNO, et al., | |
| Defendants. | |

Colin R. Dickey, a state prisoner, alleges in this civil rights action that the defendants obtained his conviction and death sentence in violation of the U.S. Constitution. He alleges among other things that prosecutors presented false testimony at his trial and withheld evidence that he could have used to impeach a crucial witness. He was partially vindicated in 2023, when the Ninth Circuit vacated his death sentence but left his conviction in place. *See generally Dickey v. Davis*, 69 F.4th 624 (9th Cir. 2023).

The defendants move to dismiss. (Docs. 62, 65.) As explained in this order, those motions are **GRANTED** with leave to amend. Dickey could pursue a potentially viable civil rights claim, but his current allegations and legal claims are too broad. They imply that he was wrongfully convicted, contrary to the circuit court's 2023 opinion and the Supreme Court's opinion in *Heck v. Humphrey*, 512 U.S. 477 (1994).

///

1

**ALLEGATIONS**

Marie Caton and Louis Freiri were found dead at home in Fresno, California, in November 1988.  (*See* Doc. 59 at 11–13.)  One suspect, a man named Richard Cullumber, attempted to flee the city a few days later, but he died by his own hand at the end of a high-speed chase.  (*Id.* at 15–16.)  A $5,000 reward prompted one of Cullumber's former roommates, Richard Buchanan, to come forward a few months later.  (*See id.* at 5.)  He claimed that Dickey had confessed to being in the home with Cullumber and the two victims at the time of the murders.  (*See id.*)

Dickey was arrested and detained.  (*See id.*)  Police then went on a search for evidence to support the case against him at a preliminary probable cause hearing.  (*See id.*)  Both the Fresno County District Attorney's Office and the Fresno City Police Department participated in the investigation.  (*Id.*)  A prosecutor named Kenneth Hahus was eventually assigned to the case.  (*See id.* at 29.)  Hahus met with Buchanan about a dozen times over the next several months, both before and after the preliminary hearing.  (*See id.* at 35–36.)  Buchanan was himself facing drug charges.  (*See id.* at 30–31.)  So in an effort to secure Buchanan's testimony, Hahus helped arrange for the charges against Buchanan to be dropped.  (*See id.*)  Investigators also did several favors for Buchanan, some of them quite valuable.  (*See id.* at 32.)  In the end, Buchanan received perks worth about $5,600.  (*Id.*)

Hahus secured Dickey's conviction at trial.  He relied heavily on Buchanan's testimony.  (*See id.* at 32–33, 35–36.)  The two of them mislead the jury about how often they had spoken before the trial, how spontaneous (or rather, how practiced) Buchanan's testimony was, and his incentives to lie or embellish.  (*See id.*)  Hahus did not disclose evidence about Buchanan's incentives to the defense, either.  (*See id.* at 30.)

Dickey was found guilty of two robbery counts, one burglary count, and two homicide counts, as well as the charged felony-murder and multiple-murder special circumstances, leading to a sentence of death.  (*See id.* at 5, 46–47.)  He challenged his conviction and sentence on appeal and in habeas corpus proceedings in both state and federal court.  *See* 69 F.4th at 634–35.  Many years later, in 2023, the Ninth Circuit conditionally granted his petition for a writ of habeas

corpus, but only in part. *Id.* at 648.  It vacated the special-circumstances findings and the death penalty, but it affirmed the district court's decision not to grant habeas relief related to the convictions themselves, i.e., with respect to the "guilt phase" of the trial. *See id.* at 645–48.

Dickey then filed this federal civil rights action.  (Doc. 1.)  The case is currently proceeding on his first amended complaint against the County of Fresno, the City of Fresno, Hahus, and several individual investigators and detectives.  (Doc. 59.)  The City, the County, Hahus, and one of the other individual defendants (Douglas Stokes) have moved to dismiss under Federal Rule of Civil Procedure 12(b)(6).  The motions are fully briefed.  The court took them under submission without hearing oral arguments.  (*See* Docs. 62, 65, 72, 73, 74, 77, 78.)

## STANDARD OF DECISION

Federal Rule of Civil Procedure 12(b)(6) permits motions to dismiss for "failure to state a claim upon which relief can be granted."  A Rule 12(b)(6) motion tests a complaint's "legal sufficiency," *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001), that is, whether it is based on "a cognizable legal theory" and includes "sufficient facts" to support that theory, *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008).  The district court's task is to decide whether the complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  This is a "context-specific task." *Id.* at 679.  The court must draw on its "judicial experience and common sense," *id.*, and accept "all reasonable inferences in favor of the nonmoving party," *Boquist v. Courtney*, 32 F.4th 764, 773 (9th Cir. 2022) (quoting *Retail Prop. Tr. v. United Bhd. of Carpenters & Joiners of Am.*, 768 F.3d 938, 945 (9th Cir. 2014)).

## HECK BAR

The defendants argue first that Dickey cannot pursue his § 1983 claims at all, citing *Heck v. Humphrey*, 512 U.S. 477 (1994).  (*See* Docs. 62 at 6–8; 65 at 7–9.)  The Supreme Court's holding in *Heck* is part of a larger legal doctrine separating civil rights lawsuits under 42 U.S.C. § 1983 from habeas petitions under 28 U.S.C. §§ 2254 and 2255 and equivalent state laws. *See Wilkinson v. Dotson*, 544 U.S. 74, 79–82 (2005).  The Court established a relatively narrow rule

3

in *Heck*: if a plaintiff's success in a § 1983 claim would necessarily imply that a conviction or sentence is unlawful, then that claim can move forward only if the conviction or sentence was previously invalidated in a state or federal habeas proceeding.  *See id.* at 80 (citing *Heck*, 512 U.S. at 479–82, 486–87).  Conversely, if the conviction or sentence has been invalidated, then a plaintiff is free to pursue a § 1983 claim that implies that the conviction or sentence is invalid.  *See id.* at 81–82.

Dickey's death sentence was invalidated in a federal habeas petition, as summarized above.  For that reason, he may pursue a claim under § 1983 even if it implies that his death sentence was invalid.  *See, e.g.*, *Powell v. Weiss*, 757 F.3d 338, 346 (3d Cir. 2014).  The defendants argue otherwise, but they do not wrestle with the fact that Dickey successfully challenged his death sentence.  (*See, e.g.*, Docs. 62 at 7–8; 65 at 7–9).  In the case they cite, the plaintiff did not argue that his incarceration was harsher as a result of his death sentence, as Dickey does.  *See Phillips v. Chappell*, No. 17-0875, 2018 WL  9875249, at *1–3 (N.D. Cal. Aug. 15, 2018).

Dickey's conviction, by contrast, has not been invalidated.  So he may not pursue a claim under § 1983 if it would imply necessarily that his conviction is invalid.  He does not limit his allegations and his claims to his capital sentence and its consequences.  Some of his allegations imply unambiguously that he is innocent of the charges against him.  That is true, for example, of his assertion that the murders occurred on November 8, i.e., contrary to prosecutors' allegations that he committed the murders on November 7.  (*See* Doc. 59 at 12–15.)  Some of his legal theories also imply that he should not have been convicted at all, nor detained before trial.  (*See id.* at 48–50.)  His allegations target his death sentence specifically at some points, such as those about the harsh practical consequences of a capital sentence.  (*See, e.g.*, *id.* at 46–47.)  But it is impossible to disentangle his broad allegations about an unlawful and unconstitutional prosecution from his narrower claims about his capital sentence, at least as he has presented them in his current complaint.

Dickey portrays this lawsuit differently in his opposition to the pending motions.  He argues that his claims "are not based on the mere fact of his being imprisoned." (Doc. 73 at 10.)

4

His object is not to prove that he should always have been free, he says, but rather to prove only that he "would have received a noncapital sentence." (*Id.* at 12 (emphasis omitted).) He may not modify his complaint by making arguments in an opposition brief. *See Schneider v. California Dep't of Corr.*, 151 F.3d 1194, 1197 n.1 (9th Cir. 1998); *Apple Inc. v. Allan & Assocs. Ltd.*, 445 F. Supp. 3d 42, 59 (N.D. Cal. 2020). The court construes his arguments as a proposal to pursue more limited allegations and legal claims in a second amended complaint.

It would ordinarily be appropriate to grant this request straightaway. Rule 15 creates a very liberal standard for amendments. *See AmerisourceBergen Corp. v. Dialysist W., Inc.*, 465 F.3d 946, 951 (9th Cir. 2006). An amendment would not be appropriate, however, if it would lead to an exercise in futility. *See id.* The defendants make additional arguments in their pending motions that might show an amendment would be futile, at least in part. The Court considers those arguments next.

**ABSOLUTE IMMUNITY**

Hahus argues he is absolutely immune to Dickey's claims for damages under section 1983. (Doc. 65 at 5–7.) Prosecutors are absolutely immune to some § 1983 claims. *See Van de Kamp v. Goldstein*, 555 U.S. 335, 342 (2009). Their immunity depends on whether their allegedly unlawful conduct was "intimately associated with the judicial phase of the criminal process." *Id.* (quoting *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976)). In other words, courts take a "functional approach to immunity." *Burns v. Reed*, 500 U.S. 478, 486 (1991). The defendant who asserts absolute immunity must "show that such immunity is justified for the function in question." *Id.*

The Supreme Court has not drawn bright lines between conduct that is "intimately associated with the judicial process" and other conduct. The dividing line is easiest to see in the contrasts between a few examples of the conduct that falls on either side of it. For example, prosecutors are immune to claims about preparing and filing charging documents, but not to claims that they falsely certified the truth of any statements within those documents. *See Kalina v. Fletcher*, 522 U.S. 118, 127 (1997). Any witness could have made the certification, but only an advocate acting as an officer of the court could have prepared and filed the case. *See id.* at

5

130. Investigative work is another example. Prosecutors are immune to claims about the work they do "in evaluating evidence and interviewing witnesses" as they prepare for trial, but not about the work they do "in searching for the clues and corroboration" that might give them probable cause to pursue an arrest. *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993). Police detectives can investigate crimes, collect evidence, and recommend an arrest, and they enjoy only qualified immunity. *See id.* at 273–74. As a final example, the Supreme Court has said that prosecutors are absolutely immune to claims about their presentation of the state's case to the court and jury at trial. *See Imbler*, 424 U.S. at 431. But it has said that they are not necessarily immune to claims about any statements they make in other places and before other audiences, such as in press conferences. *See Buckley*, 509 U.S. at 278.

Dickey alleges Hahus acted unlawfully in three related ways. First, he alleges Hahus met with Buchanan many times before the trial—and even before the preliminary probable cause hearing—to discuss Buchanan's potential testimony. (*See* Docs. 59 ¶¶ 24, 140–43; 74 at 9–10.) Although Dickey does not make the allegation expressly, his complaint implies that Hahus helped Buchanan come up with lies about Dickey's involvement in the murder, i.e., that he helped to manufacture false evidence. (*See, e.g., id.* ¶ 140–43.) Hahus has not demonstrated that he is entitled to absolute immunity for all of this conduct. Some of the Buchanan interviews might have been in preparation for the trial, conducted with a goal of presenting a compelling case to the jury. But some might also have served a more fundamental, investigative purpose, as they happened earlier in the process. "Witness interviews may serve either an investigative or an advocacy-related function, as may other methods of gathering or manufacturing evidence prior to trial." *Genzler v. Longanbach*, 410 F.3d 630, 638 (9th Cir. 2005). Hahus is not immune to the claims that he used the interviews with Buchanan to create false evidence long before the trial began, when probable cause was in question. A police detective could have done the same thing and would be entitled to qualified immunity at most. *See id.* at 639–40; *KRL v. Moore*, 384 F.3d 1105, 1111–12 (9th Cir. 2004) *Milstein v. Cooley,* 257 F.3d 1004, 1010 (9th Cir. 2001).

Second, Dickey alleges Hahus helped ensure that charges against Buchanan would be dropped in exchange for his testimony, at one point even appearing at a hearing in Buchanan's

6

case. (*See* Docs. 59 ¶¶ 120, 123–25; 74 at 10.)  As explained above, charging decisions are the bread and butter of a prosecutor's work, and prosecutors are absolutely immune to claims about those decisions. *See Imbler*, 424 U.S. at 431.  But Dickey does not allege that Hahus is liable for deciding not to prosecute Buchanan.  Dickey alleges instead that Hahus helped Buchanan avoid charges as a favor, as part of his broader effort to buttress a false narrative in Dickey's case.  It is not necessarily a prosecutor's job to suggest to a potential witness that a charge might disappear if he cooperates.  A police detective, too, can promise to put in a good word with the district attorney and can appear at a hearing.  *See Buckley*, 509 U.S. at 276 (rejecting assertion of absolute immunity based on claims that prosecutors helped find and retain an expert who was willing to give helpful testimony against the plaintiff).  "[P]rosecutors are not performing a prosecutorial function when they undertake a role that could be fulfilled by someone other than a prosecutor[.]" *Gibson v. City of Portland*, 165 F.4th 1265, 1283 (9th Cir. 2026).

Third, Dickey alleges Hahus knew about, but did not disclose, favors that Buchanan received from others, such as food, housing, and cash.  (*See* Docs. 59 ¶¶ 129–30; 74 at 10.)  The complaint does not allege that Hahus learned about these favors early in the case, before the probable cause hearing, for example, or that he violated some disclosure obligation that was independent of his role as a trial lawyer.  The complaint implies instead that Hahus's disclosures fell short as the case was ramping up for trial, then presented false testimony about the favors during the trial.  (*See* Doc. 59 ¶ 130.)  Prosecutors are absolutely immune to claims that they "maliciously initiated a prosecution, used perjured testimony at trial, or suppressed material evidence at trial." *Genzler*, 410 F.3d at 637 (citing *Imbler*, 424 U.S. at 430).  For these reasons, Hahus has shown that he would be absolutely immune to Dickey's current allegations about his failure to disclose these other favors.  But it is possible that Dickey could clarify his allegations in a further amended complaint, and it is possible a clarification could show Hahus is not absolutely immune.  In short, Hahus's assertion of absolute prosecutorial immunity does not show that an amendment would be futile.

**MONELL CLAIMS**

The County argues Dickey does not state a claim against it under *Monell v. Department of*

7

*Social Services*, 436 U.S. 658 (1978).  (Doc. 65 at 9–12.)  The Supreme Court decided in *Monell* that a municipal government like Fresno County can be liable under § 1983, but not simply because one of its employees acted unlawfully.  *See* 436 U.S. at 692.  Plaintiffs who sue municipalities under § 1983 must ultimately prove the municipality itself acted unlawfully—that it had a policy amounting to deliberate indifference for the plaintiffs' constitutional rights.  *Jones v. City of N. Las Vegas*, 168 F.4th 1131, 1140 (9th Cir. 2026).  Dickey is pursuing two such theories of unconstitutional actions.

First, he alleges there was a longstanding practice within the Fresno district attorney's office not to disclose evidence that must be disclosed under *Brady v. Maryland*, 373 U.S. 83 (1963) and other similar cases.  (*See* Doc. 74 at 22–23 (summarizing allegations).)  A claim like this can succeed only if the County had "actual or constructive notice" of the allegedly unconstitutional state of affairs, so "a plaintiff must typically provide evidence of 'a pattern of similar constitutional violations by untrained employees.'"  *Jones*, 168 F.4th at 1140–41 (quoting *Connick v. Thompson*, 563 U.S. 51, 62 (2011)).  In other words, the County's liability "may not be predicated on isolated or sporadic incidents."  *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996).  "[I]t must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy."  *Id.*  Dickey's complaint includes allegations about several cases that were similar to his, in addition to other allegations about the surrounding circumstances.  (*See* Doc. 59 ¶¶ 155–56, 167–83.)  These allegations could suffice at this early stage to show that a claim under *Monell* is plausible.  *See Est. of Osuna v. County of Stanislaus*, 392 F. Supp. 3d 1162, 1173 (E.D. Cal. 2019) (collecting authority on the types of allegations that suffice to show a *Monell* claim based on custom and practice is plausible).  They suggest strongly that an amendment would not be an exercise in futility.

Second, Dickey alleges the County ratified Hahus's unconstitutional actions.  (*See* Doc. 74 at 25–26 (summarizing allegations.).)  To prevail in a claim of this type, the plaintiff must ultimately demonstrate that the person who ratified the unconstitutional actions made a "conscious, affirmative choice."  *Gillette v. Delmore*, 979 F.2d 1342, 1347 (9th Cir. 1992).  The responsible official must have selected the allegedly unconstitutional course of action "from

among various alternatives," *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986), or alternatively, must have approved a subordinate's decision "and the basis for it," *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988).  Dickey alleges here that a supervisor approved prosecutors' decision to dismiss the case against Buchanan in an effort to secure his testimony. (*See, e.g.*, Doc. 59 ¶ 117.)  He does not allege, however, that supervisors approved of Hahus's allegedly unconstitutional efforts to manufacture evidence or to withhold evidence in violation of *Brady* and other similar cases.  For these reasons, Dickey could not pursue a ratification theory based on his current allegations.  But he could potentially fill these gaps with amendments.  In any event, it is not clear that a further amendment would be futile.

**CONCLUSION**

The motions to dismiss (Docs. 65, 74) are **GRANTED** with leave to amend.  Any second amended complaint must be filed within thirty days.

IT IS SO ORDERED.

Dated:   **June 12, 2026**

UNITED STATES DISTRICT JUDGE